Robert ORCHARD, Plaintiff,

v.

Albert COVELLI d/b/a 4316 Buffalo Road, Erie, Pennsylvania, and 4316 Buffalo Road, Inc., Defendant.

Robert ORCHARD, Plaintiff,

v.

Albert COVELLI, individually, and t/d/b/a 4316 Buffalo Road, Erie Pennsylvania, and 4316 Buffalo Road, Inc. 4319 Peach Street, Inc., t/d/b/a 4319 Peach Street, Erie, Pennsylvania, 2170 East Lake Road, Inc. 909 Peninsula Drive, Inc., 1311 Broad Street, Inc., 2650 26 Street, Inc. and 1115 Sassafras, Inc., Girard, Pennsylvania, John T. Milligan, Secretary of the Corporations, Defendants.

Civ. A. Nos. 78-72 ERIE, 81-149 ERIE.

United States District Court,
W.D. Pennsylvania.

July 6, 1984.

Wayman, Irvin & McAuley, Pittsburgh, Pa., for plaintiff.

John G. Gent, Erie, Pa., for defendant.

WEBER, District Judge.

## I. INTRODUCTION

This is a removed action filed by a minority shareholder of a closely-held corporation, Robert Orchard, seeking various forms of legal and equitable relief. The lawsuit parallels a family dispute over the ownership and control of a number of McDonald Corporation fast food restaurants located in and about Erie, Pennsylvania, and now owned in the majority by the defendant Albert Covelli.

Tolstoi once wrote that "happy families are all alike; every unhappy family is unhappy in its own way." We sense that Tolstoi was less familiar with the American modern law of closely-held corporations from which we note an alarming similarity in the demise of such entities where the survival of a business association is so perilously tied to the continuing vitality of intimate personal relationships. Many lawsuits arising from disputes among shareholders in closely-held corporations are characterized by the parties' inability to separate the business and personal aspects of their relationship. We find ourselves struck by the unavailability or inadequacy of identifiable legal remedies to aid minority shareholders in redressing abuses by majority shareholders equipped with unfettered power over the management of the close corporation. We bind ourselves to a careful balance of equities in fashioning appropriate relief under the present circumstances. The task of this court has been complicated by the nature of the past dealings between the parties and by factors which are peculiar to the scope and terms of franchise agreements. We are constrained to note here that the weight of our responsibility has not been lightened by the manner in which plaintiff's counsel presented his case.

As a result of our review of the evidence and applicable law, supplemented by detailed legal memoranda filed by the parties, we find that the vast majority of Mr. Orchard's claims are without merit and that the law does not recognize a right to recovery. Yet our analysis is predicated on the fact that majority shareholders stand in a fiduciary relationship with minority interest holders. In this light we find that the plaintiff Orchard is entitled to relief as a result of a systematic "freeze-out" orchestrated by the defendant Covelli. We are convinced that there existed a clear intent on the part of the majority shareholder to use seemingly legitimate means to exclude Mr. Orchard from his benefit and interest in the various franchises.

After a non-jury trial which culminated extensive discovery and pursuant to the Federal Rules of Civil Procedure Rule 52(a) we make the following findings of fact.

## II. FINDINGS OF FACT

1. Robert Orchard, the minority shareholder, and Albert Covelli, the majority shareholder, together, are the only shareholders of some seven corporations operating McDonald's fast food restaurants in Erie, Pennsylvania.

2. From 1962 to 1977 these two men worked closely to develop these restaurants into a viable, profitable business. Covelli had operated a number of McDonald's restaurants in and around Canton, Ohio for several years. Orchard had no previous experience in the fast food industry but had become interested in the ownership of a McDonald Franchise after several conversations with his brother-in-law Covelli. Under an agreement the two men decided to become partners with each receiving 50% of the Canton Store.

3. In 1964, Covelli was approached by a group of investors (hereinafter referred to as "the Chicago Group") interested in purchasing three McDonald's restaurants then operating in Erie, Pennsylvania. Covelli proposed to Orchard that he join in the purchase of these Erie stores and ultimately the three parties agreed to joint participation in the restaurants at Peach Street, Peninsula Drive, and East Lake Road.

4. Under the joint participation agreement each of the three Erie restaurants was separately incorporated with each corporation bearing the name of the location of the restaurant it represented, i.e. Peach Street, Inc., Peninsula Drive, Inc., and East Lake Road, Inc.

5. The corporations held three principal assets:
   (i) Leasehold interest, in the buildings and lands which served as the sites of the restaurants;
   (ii) Fixed assets in the form of equipment and cooking utensils necessary for the operation of a fast food restaurant;

(iii) A franchise for a term of twenty years from McDonald's corporation authorizing the operation of a fast food restaurant.

6. Shares in the corporations were divided between the participants in the joint venture as follows:
   (i) Chicago group—45%;
   (ii) Albert Covelli—40%;
   (iii) Robert Orchard—15%

7. The following officers' positions were established:
   (i) President—Albert Covelli—he was charged with general supervision of operations and was required to travel frequently from Canton, Ohio, to Erie. At the outset Covelli did not receive a salary but he did receive a travel allowance.
   (ii) Vice-President—Robert Orchard—he was charged with responsibility for the day to day operation of the restaurants. He received a salary of $10,400 per year per restaurant. Orchard was required to move from Canton, Ohio to Erie.

8. By 1975, the joint venture had opened three additional McDonald's franchises, West 26th Street, Inc., Broad Street, Inc. and Sassafras Street, Inc. with identical shareholder participation as in the original three corporations.

9. By 1975, the compensation for the officers was as follows:
   (i) Covelli—$16,600 per year/per restaurant or $96,000;
   (ii) Orchard—$10,400 per year/per restaurant or $62,400.

10. In 1975, McDonald Corporation became interested in a new location at 4316 Buffalo Road, Erie, Pennsylvania (hereinafter "Buffalo Road Restaurant"). Orchard assisted with the selection of the site for the franchise. Unbeknownst to Orchard the Chicago Group did not have an interest in the Buffalo Road restaurant. Orchard's ownership interest in the Buffalo Road Restaurant remained the same (15%), Covelli's interest increased from 40% to 85%. Although the Buffalo Road Restau-

rant was not formally incorporated until 1979, Orchard and Covelli generally treated the Buffalo Road Restaurant as a *de facto* corporation.

11. The Buffalo Road Restaurant was located in the franchise territory of the East Lake Road restaurant. In January, 1975, Orchard and Covelli as officers of the East Lake Road restaurant executed a waiver in order to allow the Buffalo Road restaurant to operate within the exclusive licensed territory of the East Lake Road Restaurant.

12. In 1977, Albert Covelli and his attorney, also the attorney for the corporation, John Milligan, commenced negotiations with the Chicago Group in order to buy out the latter's interest in all the Erie McDonald restaurants. During the period of these negotiations the Chicago Group was not told about the existence of the Buffalo Road restaurant. In February of 1977, the shareholders of the six Erie restaurants authorized Covelli to enter into negotiations aimed at purchasing the stock held by the Chicago group. As a director for the six corporations, Orchard was aware of and authorized the negotiation which led to this stock redemption.

13. In May of 1977, the Chicago Group entered into a stock redemption agreement covering its holdings in all six Erie corporations. The formula for redemption provided that the Chicago Group was to receive fifty cents for each dollar of gross sales recorded by these stores in the fiscal year ending February 28, 1977.

14. As a result of this redemption the interests in the various corporations changed as follows:

(i) Covelli's interest increased from 40% to 73%;

(ii) Orchard's interest increased from 15% to 27.5%.

15. Orchard was not a party to the negotiations for the buy-out of the Chicago Group. After a review of the terms of the buy-out agreement, he requested to be bought out on the same terms as the Chicago Group. At this time both Covelli and Orchard had become dissatisfied with their business relationship.

16. Covelli prepared a proposed stock redemption agreement covering Orchard's holdings in all six original Erie McDonald's restaurants. The agreement provided for the purchase of Orchard's stock on the same formula as that used in redeeming the stock of the Chicago Group. Under this formula Orchard was to receive approximately $319,000 for his interests in these corporations. The agreement also contained a covenant not to compete.

17. The proposed redemption agreement provided Orchard no consideration for his interest in the Buffalo Road restaurant. Negotiations over the stock redemption reached an impasse on the issue of compensation for the Buffalo Road restaurant.

18. When Orchard refused to give up his interest in the Buffalo Road restaurant for no consideration, Covelli made known his intention to remove Orchard from any responsible position in the corporation.

19. On August 18, 1977, Mr. Milligan, on behalf of the Erie McDonald's corporations informed Orchard that his employment was terminated.

20. At the annual shareholders meeting held in March, 1978, Covelli as majority shareholder voted to remove Orchard from the Board of Directors of the six corporations. Orchard was replaced on the Board of Directors by Covelli's son.

21. It is undisputed that the corporations have not paid dividends to their shareholders in over five years.

22. Orchard through his counsel has exercised his right of access to all corporate records and to participate in all shareholders' meetings.

23. Orchard continued thereafter to hold a 27.5% interest in the six original corporations and a 15% interest in the Buffalo Road restaurant.

24. Following Orchard's discharge as Vice-President and Director, three of the McDonald's franchises held by these corporations expired; Peach Street, July 31, 1981; 2170 East Lake Road, November 30, 1981; Peninsula Drive December 31, 1981.

25. These franchise agreements each contained a clause providing for renewal of

the franchise for a term of five years. It stated that the current franchisee "will be given first consideration [by McDonald's] for an additional franchise period of five years."

26. Under the system of controls set up by McDonalds for the issuance of a franchise, a prospective franchise must adhere to certain non-negotiable conditions dictated by McDonald's. McDonald's will not permit any assignment or transfer of its franchise without prior approval.

27. Covelli was contacted in 1978 by McDonald's regarding renewal of the franchises for the three original Erie restaurants. McDonald's offered to renew the franchises in Covelli's name alone, Covelli accepted, and the franchises were issued to Covelli individually. Covelli did not attempt to exercise the option to renew contained in the franchise held by the Erie corporations.

28. McDonald's learned from Attorney Milligan on March 23, 1979, that Orchard had acquired a franchise in a restaurant of a competing restaurant chain and was then in violation of the franchise anti-competition clause.

29. After obtaining the franchises in his own name, Covelli requested that McDonald's permit assignment of the new franchises to the corporations which formerly operated the Erie restaurant. These requests were denied by McDonald's.

30. Covelli entered into agreements with the three Erie corporations, whose franchises had expired, for the purchase of equipment, furniture, fixtures, leasehold improvements, signs and land owned by the Erie corporations. These assets were purchased at book value. Mr. Milligan served as counsel for both Covelli and the corporation in these transactions. These sale proposals were ratified by the shareholders

with the minority interest held by Orchard either dissenting or abstaining.

31. The Chicago Group had learned of the seventh store from Orchard when the latter made inquiries of members of the Chicago Group as to how their equity in the Buffalo Road store had been valued in the buy-out. The inquiry was made in anticipation of the present action.

32. On May 2, 1980, at Civil Action No. 80–66 Erie, Rae Schupack, individually and on behalf of all other stockholders of 2170 East Lake Road, Inc.—particularly the Chicago Group—brought a stockholder's derivative suit against Covelli, Orchard, 2170 East Lake Road and McDonald's Corporation alleging violation of the federal securities laws because of the failure to disclose the existence of the seventh Erie McDonald's franchise at Buffalo Road. A stay of the present action was issued. On the eve of trial, November 13, 1981, the Schupack suit was settled and dismissed and the stay of this action was lifted.

## III. DISCUSSION

Plaintiff's complaint presents several charges against Covelli; (a) misappropriation of corporate assets and opportunities; (b) breach of an alleged oral contract to give Orchard 50% interest in all the franchises; (c) breach of a contract of employment; and (d) breach of fiduciary duty to minority stockholders. Plaintiff also makes certain claims for equitable relief which we will address in due course.

### A. MISAPPROPRIATION OF CORPORATE ASSETS AND OPPORTUNITIES

Orchard alleges several claims of misappropriation of corporate assets and opportunities on the part of Covelli. These include, (a) failure to seek an extension of the franchise life of three corporations[1] for

---

**1.** According to Orchard, McDonald's initiated the proceeding for re-writing the Erie franchises in 1978 beginning with the Peach Street franchise, and that it then included the East Lake Road and Peninsula Drive franchises in 1980. Covelli ordinarily would receive a letter well in advance of the date the franchises were set to expire. Three years earlier in negotiations for

the franchises for the other restaurants Covelli persisted in negotiations until the re-write committee accepted Orchard as a minority owner. Orchard alleges that Covelli purposefully failed to be persistent with McDonald's with regard to the Peach Street, East Lake Road, and Peninsula Drive restaurants.

five years as provided in the franchise agreements; (b) procuring the renewal of the franchises under a separate agreement in Covelli's name only; (c) acquiring in Covelli's name alone the Buffalo Road store which is situated within the exclusive territory of the East Lake Road restaurant; (d) allocating funds from the Buffalo Road Store to finance the Girard Store which was solely owned by Covelli; (e) expending corporate assets for personal use and making purchases of personal items for himself and family members and (f) selling at book value assets of the corporations, whose franchises had expired, to the newly franchised corporations held by Covelli.

■ With respect to Covelli's alleged failure to seek an extension of the franchise we note that the franchise agreements for the six corporations were for a term of twenty years and provided that the holder of the franchise would receive "first consideration" for an extension of each franchise for five years. Covelli takes the position that the McDonald's re-write committee had complete discretion in deciding whether to renew a franchise, that the then existing corporations had no right to a franchise renewal, that McDonald's considered the suitability of the then existing corporations for renewal, and that McDonald's possessed information which made the prospect of a franchise renewal in Orchard's name unattractive.

We agree that McDonald's was under no obligation to renew the franchises. The requirement of "first consideration" places very little burden upon McDonald's. *See, McDonald's Corporation v. Markim, Inc.,* 209 Neb. 49, 306 N.W.2d 158 (1981). Absent any entitlement, Covelli cannot be said to have usurped a corporate opportunity over which the corporations had little control. While we do not feel that Covelli's conduct constitutes misappropriation of a corporate asset, he may have had a fiduciary duty to minority shareholders to seek a renewal of the franchises prior to expiration. This is a matter to which we shall return.

■ Similarly, the procurement of a renewal of the franchises under a separate agreement in Covelli's name alone does not constitute the misappropriation of a corporate asset or opportunity where discretion as to the award of a franchise rested exclusively with McDonald's and was a matter over which Covelli could not exercise unilateral control. The evidence indicates McDonald's gave consideration to renewing the franchises with Orchard as a shareholder. There is evidence of McDonald's dissatisfaction with Orchard's performance as manager. McDonald's was aware at the time of the renewal that Orchard was not participating in the operation of any Erie restaurants. McDonald's had a policy not to grant franchises to entities which were not fully owner-operated. It had learned, from Milligan, that Orchard acquired a franchise in a restaurant of a competing restaurant chain, contrary to the express conditions of the Erie franchise. *See, e.g., Martino v. McDonald's System, Inc.,* 598 F.2d 1079 (7th Cir.1979).

As a consequence, McDonald's refused to renew the franchises in the name of the corporation in which Orchard had an interest and thereafter specifically refused Covelli's request to be allowed to assign the leases to these corporations. Under the circumstances, the corporations in which Orchard had an interest had no right of renewal enforceable against McDonald's, and McDonald's decision to invest Covelli with exclusive franchises cannot form the basis to claim for misappropriation of a corporate asset.

■ The acquisition of the Buffalo Road restaurant does not amount to the misappropriation of a corporate asset where the plaintiff Orchard assented to the acquisition and received an interest in the restaurant.

■ We do not find any misappropriation of corporate assets with regard to funds advanced or stock interchanged by Buffalo Road, Inc. to the Girard restaurant. The evidence supports the finding that these amounts were paid back in full with interest at or around the end of the fiscal year, 1979. While such conduct does not constitute a misappropriation of corpo-

rate assets on the part of Covelli, it is a factor which bears upon the question of Covelli's fulfillment of his fiduciary duties vis-a-vis minority shareholders who hold interests in the other seven operations.

■ Finally, Orchard complains that in 1969 a condominium was acquired in Florida with funds from the six corporations. It was later sold and a house was purchased with the proceeds. It appears that various officers of the corporation, including Orchard himself, used the condominium while he was an officer of the corporation. The practice appeared to have a business purpose as between Orchard and Covelli. The practice was discontinued in 1978 on the advice of Covelli's lawyers and accountants.

Orchard complains that the corporation paid various expenses for Sam Covelli, the son of the defendant. He was an employee and we note that such expenses are often considered as additional compensation.

We find these practices insufficient in themselves to constitute a misappropriation of corporate assets. Again, we consider these where appropriate in the analysis of Mr. Covelli's conduct with respect to his responsibility as a fiduciary to the minority stockholders.

■ Plaintiff also alleges that the disposition of the assets of the former franchise corporations by Covelli to the new corporation owned exclusively by Covelli violated a duty to the corporations and its shareholders.

We previously noted that the franchise was the most valuable asset owned by the individual corporations. Having no franchise, we concede that the former corporations had no alternative but to sell their assets. These assets were sold to Covelli individually for book value or more than book value. Orchard was given a chance to get better offers and the sale was postponed for that purpose. No better offer was secured notwithstanding Orchard's assertion to the contrary. We find that Covelli's actions in disposing of the equipment was in the interest of the corporations as they existed following the expiration of their prime asset, the McDonald's fran-

chise. The fact that Covelli in his capacity as the new owner of the franchise was in a unique position to benefit from the sale does not alone establish a breach of his duty to the other shareholders of the former corporation.

### B. ORAL CONTRACT

Orchard claims that by the terms of an oral agreement with Covelli, he was to become a 50% partner with Covelli in the restaurants not shared in by the Chicago group. This would include the Buffalo Road Restaurant. Covelli responds that Orchard has failed to meet his burden in proving an oral agreement and, even if such an agreement were found to exist, that there also existed a condition precedent to Covelli's obligation to perform. Covelli suggests that the condition precedent here is his power and ability to carry out the alleged oral promise. Unless McDonald's agreed to grant the franchise to Covelli and Orchard, Covelli could not give Orchard a 50% interest. We agree, yet this argument ignores the applicability of the term of the alleged agreement to the ownership of those corporations in which Orchard already shared an interest. For example, Orchard held 15% of the shares in the Buffalo Road restaurant and the balance of the stock was owned by Covelli alone. Acquisition of the Buffalo Road restaurant took place after the alleged agreement and included Orchard's ownership participation.

Orchard testified that he moved to Erie with the understanding that should any *additional* McDonald's franchises be obtained without the participation of the Chicago Group, Covelli and Orchard would be equal partners in the new franchises. Originally, beginning in 1964, Orchard participated in the ownership of the three original franchises; Peach Street, Peninsula Drive, and East Lake Road. In 1968 and thereafter Covelli and Orchard began to acquire and operate restaurants at three additional locations, Broad Street, West 26th Street, and Sassafras. The Chicago Group participated in each of these six

restaurants with the ownership divided among the Chicago Group 45%, Covelli 40%, and Orchard 15%. In 1975, a new restaurant was established at 4316 Buffalo Road. Ownership was divided between Covelli, 85%, and Orchard 15%. Orchard testified that he assumed from this percentage that the Chicago Group was involved in the ownership of the Buffalo Road restaurant. Orchard testified that representations were made to him that the Chicago Group was involved in the Buffalo Road restaurant and that at the time of the buy-out they were paid for their interest. He testified Covelli heard the representation, knew they were not true, but remained silent.

■ Notwithstanding Covelli's representation with regard to the Chicago Group, we must look to the available evidence to determine whether Orchard's proofs establish the existence of a contract. One asserting an oral contract must show that the contract was clear and precise. *Miller v. Wise*, 33 Pa.Super. 589 (1907). We find the evidence is insufficient to support such a claim.

■ Covelli testified of assurances given him by Covelli that they would be 50/50 partners, and that Covelli would take care of him (Orchard). While these representations supply a basis for Covelli's belief that there would be equal participation in those restaurants owned exclusively by Covelli and Orchard, they are insufficient to establish a binding oral contract between the parties. Accordingly, Orchard's claim of an oral contract must be rejected. Again, we find Orchard's claim to be credible and will return to the effect of such representations respecting the Chicago Group's participation.

## C. BREACH OF EMPLOYMENT CONTRACT

■ Orchard alleges that he was wrongfully discharged on August 18, 1977 by Milligan, acting for the corporations. He contends that this was a violation of his employment contract. We find no evidence of the existence of a contract for employment, oral or written. Orchard's position as stockholder and officer of the corpora-

tion gave him no position of tenured employment. In the absence of a contract or any statutory prohibition, no claim can be made. An employer may terminate employment "at any time, for any reason or no reason." *Fleming v. Mack Trucks, Inc.*, 508 F.Supp. 917, 920 (E.D.Pa.1981). This is the law of Pennsylvania. *Geary v. U.S. Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974).

## D. BREACH OF FIDUCIARY DUTY TO MINORITY STOCKHOLDERS

■ Courts have consistently recognized that the duty of loyalty owed to the corporation by the controlling interest holders includes a duty of loyalty and fairness to minority shareholders. *David J. Greene and Co. v. Dunhill International, Inc.*, 249 A.2d 427 (Del.Ch.1968); *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*, 14 Del.Ch. 1, 120 A. 486 (1923). Where a majority shareholder stands to benefit from his decisions as a controlling stockholder, the law requires that the majority's action be "intrinsically fair" to the minority interest. Arsht, *The Business Judgment Rule Revisited*, 8 Hofstra Law Review 93, 115 (1979). A policy of corporate governance which has as its objective the denial of benefits to the minority interest runs afoul of this fairness standard and calls to question the majority's fulfillment of its fiduciary duty to the other shareholders.

■ Courts have found an abuse of the corporate process in the context of mergers designed to discount or remove the minority interest. *Singer v. Magnavox*, 380 A.2d 969 (Del.1977). The corporate process may not be used legitimately to remove the participation of minority shareholders. *See generally, Coleman v. Taub*, 638 F.2d 628 (3d Cir.1981) (fiduciary duty of fairness and good faith owed by majority involves a careful analysis of equities in each case). Self-dealing is present when the minority shareholder is denied the right to participate in the benefits of the corporation. *See, e.g. Trans World Airlines, Inc. v. Summa Corp.*, 374 A.2d 5, 10 (Del.Ch.1977); *Harriman v. E.I. Dupont de Nemours & Co.*, 411 F.Supp. 133

(D.Del.1975). And it is well recognized that "a majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interest at the expense of the corporate interests." *United States v. Byrum,* 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972); *see also, Overfield v. Pennroad Corporation,* 42 F.Supp. 586 (E.D.Pa.1941). Adherence by the majority interest to a fiduciary duty of strict fairness is particularly critical in the context of the closely-held corporation.

The acute vulnerability of minority shareholders in the closely-held corporation is well recognized. It stems principally from two factors. Because of its controlling interest, the majority is able to dictate to the minority the manner in which the corporation shall be run. In addition, shares in closed corporations are not publicly traded and a fair market for these shares is seldom available. In contrast, a partner can act to dissolve a partnership anid a shareholder in a large public-issue corporation can sell his stock on the market if he is dissatisfied with the way things are run. Dissension within the close corporation tends to make the minority interest even more unattractive to a prospective purchaser. As a consequence, a shareholder challenging the majority in a close corporation finds himself on the horns of a dilemma, he can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder. Such is the case here.

Frequently, closed corporations originate in the context of relationships personal in nature, often undertaken by family members or friends. It is ironic that these enterprises become a most frequent setting for the exploitation of minority shareholders when the personal relationship has gone sour. *See, e.g. Thrasher v. Thrasher,* 27 Cal.App.3d 23, 103 Cal.Rptr. 618, 621 (1972) (marital dispute led to withholding of dividends); *Blackman v. Las Vegas-Tonopah-Reno Stage Line, Inc.,* 86 Nev. 754, 755, 476 P.2d 964, 965 (1970) (interfamily dispute sparked wrongful withdrawal and use of family corporation's funds by its officers and directors); *Johnston v. Liv-ingston Nursing Home, Inc.,* 282 Ala. 309, 312, 211 So.2d 151, 154 (1968) (pronounced differences of opinion between two sisters as to the physical operation of the project); *In re William Faehndrich, Inc.,* 2 N.Y.2d 468, 471, 141 N.E.2d 597, 599, 161 N.Y.S.2d 99, 101 (1957) (majority shareholder's concern over his father's transfer of property to a younger brother helped trigger decision to squeeze father out of business). *See also,* Levinson, *Conflicts that Plague Family Businesses* 49 Harv.Bus.Rev. 90 (1971) (author states "wisest course for any business, family or non-family, is to move to professional management as quickly as possible").

Because of these factors, the law imposes a fiduciary duty upon the majority requiring it to act with the utmost good faith and loyalty in transacting corporate affairs. We note from reported cases that it is a duty frequently honored in the breach. *See generally,* F.H. O'Neal, *Oppression of Minority Shareholders,* (1975), Supp.1983.

It follows that any attempt to "squeeze out" a minority shareholder must be viewed as a breach of this fiduciary duty. The reasons for excluding an obstreperous shareholder may often appear compelling to the majority, and the conduct which eventually leads to a "squeeze-out" may not have been undertaken with such an intent. Yet such conduct is injurious when the result is the exclusion of minority shareholders without adequate recompense and it is particularly harmful when carried out with malevolence or indifference. The law recognizes a right to recovery under such circumstances.

Tactics employed against a minority shareholder to effect a squeeze out can take on many forms including generally oppressive conduct, the withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority stockholders, withholding information relating to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholders appraisal rights, failure to hold meetings and excluding the minority from a meaningful role in the corporate decision-making.

In the present case we find that the fiduciary duty owed the minority shareholder was all but ignored by the defendant Covelli. We note a systematic effort to exclude Orchard from any meaningful role in the corporations as well as an effort to deny him benefits therefrom.

First, Covelli insisted that Orchard accept the proposed stock redemption agreement covering Orchard's holdings in the six original Erie restaurants. When Orchard refused unless the agreement included compensation for the seventh store, the Buffalo Road store, Covelli made known his intention to push Orchard into bankruptcy, remove him from any responsible position in the corporation, and to deny him access to any benefit from the corporation. On August 18, 1977, Orchard was informed that his employment was terminated. Notwithstanding the nature of Orchard's performance on the job, the evidence indicates that he was terminated as part of a plan to squeeze him out of the corporate enterprises. Eight months later at the annual shareholders' meeting held in March, 1978, Covelli, as majority shareholder, voted to remove Orchard from the Board of Directors of the six corporations.

The removed minority shareholder is frequently replaced by someone who is closely related to the majority shareholder. The practice is typical of a consolidation of power and tends to aggravate the psychological impact to the minority stockholder. Orchard was replaced on the Board of Directors by Covelli's son.

Finally, it is undisputed that the corporations had not paid dividends to their shareholders in the five years preceding this litigation.

Second, Covelli's refusal to compensate Orchard for his interest in the seventh restaurant is itself evidence of a breach of the majority shareholders' fiduciary duty. Courts have fashioned relief in instances where a squeeze out was effected by an "inside" shareholder purchasing the shares of a minority holder without disclosing information which bears upon the value of the shares. *See generally,* Annotation,

*Duty and Liability of Closely Held Corporations, its Directors, Officers, or Majority Stockholders, in Acquiring Stock of Minority Shareholders,* 7 A.L.R.3d 500 (1966). Covelli bought out the Chicago Group but failed to disclose to them the fact of the existence of the Buffalo Road Restaurant. A distinct, but related and perhaps more damaging harm occurred in the offer to Orchard where the existence of the restaurant was known but compensation for it was deliberately excluded from the buy-out price. After Orchard declined to accept the offer, it was withdrawn and the franchises of the three corporations eventually expired. In the end Orchard was left with an interest in the corporate shells. Covelli's bargaining power in the face of the eventual expiration of the franchises and his ability to forcefully command the buy-out price cannot be overlooked. It was a bargaining position he knowingly exploited to the detriment of the minority shareholder.

Covelli failed to use his best efforts to procure the continued life of the existing franchises in the names of the corporations. The defendant relies on McDonald's reluctancy to deal further with Orchard. This was due in part to the fact that Milligan notified McDonald's of Orchard's involvement in a competing restaurant franchise. Covelli contends that such a report was required to avoid the risk of putting the corporations in breach of the franchise agreements. This is reasonable yet there is no evidence to suggest that the fact of the breach once known to McDonald's presented a peril to the corporations. Orchard's acquisition of such an interest is a predictable response to corporate dissension. *See generally, Carr v. Carr O'Brien Co.,* 386 Pa. 196, 125 A.2d 607 (1956); *Hyman v. Velsicol Corp.,* 342 Ill.App. 489, 97 N.E.2d 122 (1951). More importantly, we do not find Orchard's conduct in acquiring such an interest vis-a-vis his responsibilities to the corporation any more harmful to the then existing corporations than Covelli's decision to open additional restaurants within their exclusive territory or by use of their operating funds. Orchard's competing interests were in Florida. The expan-

sion of Covelli's unilateral interest in additional restaurants cannot be said to be a benefit to those restaurants in which Orchard shared an interest. The defendant consistently placed his duty to McDonald's before his duty to the shareholders of the corporations even when the terms of the agreement franchise did not require it.

The duty of utmost good faith and loyalty in the context of closely-held corporations has been recognized by a number of courts confronting similar fact situations. In *Donahue v. Rodd Electrotype*, 367 Mass. 578, 328 N.E.2d 505 (1975), the president and majority shareholder of Rodd Electrotype, a closely held Massachusetts corporation, sold 45 shares of company stock valued at $36,000 to the corporation. Prior to the sale the majority shareholder, Harry Rodd, shifted his controlling interest and management responsibilities to his children. The transaction was negotiated by Rodd's son, the corporation's new president, and authorized by the Board of Directors consisting of Rodd's two sons and the family attorney. The purchase merely served to redistribute the Rodd family interest among family members. Plaintiff was the major non-family minority shareholder and refused to ratify the transaction. The sale was consummated and plaintiff then offered her shares to the corporation at the price paid to Harry Rodd. Plaintiff had previously rejected lesser offers made over a period of several years. Upon refusal of the offer, plaintiff commenced an action in Massachusetts state court to have the purchase of Harry Rodd's shares rescinded. The complaint was dismissed and the intermediate state appellate court affirmed. The Massachusetts Supreme Judicial Court reversed.

The Supreme Court considered several aspects of the close corporation, those characterized by; (a) the existence of only a small number of shareholders, (b) the fact that no ready market is available to the corporate stock, (c) and the substantial majority stockholder participation in the management, direction and operation of the corporation. 328 N.E.2d at 511. It concluded that because a close corporation resembles a partnership with limited ownership and a high level of mutual dependency, because it requires close cooperation in management, and because the majority can control corporate decision-making to the detriment of the minority, Courts must be prepared to fashion special relief in appropriate circumstances. As a result, Chief Justice Tauro concluded, "stockholders in a close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." 328 N.E.2d at 515, *quoting Cardullo v. Landau*, 329 Mass. 5, 8, 105 N.E.2d 843, 845 (1952) (case arising in conduct of partnership).

The judicial relief fashioned in *Donahue* reflected the Court's concern with the vulnerability of minority shareholders in close corporations particularly where the distribution of assets is involved. The Court concluded that the stock repurchase arrangement between Rodd Electrotype and its majority shareholder made it incumbent upon the majority to "cause the corporation to offer to each stockholder an equal opportunity to sell a ratable number of shares to the corporation at an identical price." 328 N.E.2d at 518. The failure to do so, the Court determined, entitled the minority interest to relief either in the form of rescission of the primary sale or a requirement that the corporation purchase the minority interest at a price paid the majority.

We think this a sound result, one which is applied easily to the present case.

## IV. REMEDY

■ In determining the appropriate remedy we have been provided little guidance by the plaintiff. We find the relief sought in the form of corporate dissolution and receivership to be inappropriate and deleterious. We have found the vast majority of Orchard's claims to be without merit. His interests can be adequately protected without the need for so drastic a remedy. *See, e.g., Rumbaugh v. Beck*, 491 F.Supp. 511 (E.D.Pa.1980).

The Pennsylvania Business Corporation Law provides for dissolution in those circumstances where it can be demonstrated: (a) the acts taken by the persons in charge

are illegal, oppressive, or fraudulent and the interests of the shareholder would be benefited by dissolution, or (b) the corporate assets are being misapplied. 15 P.S. § 2107(A)(2)(3). While we find a breach of the majority's fiduciary duty we do not think that the extraordinary measure of dissolution is appropriate or necessary. Dissolution would not be beneficial as a practical matter nor in the best interest of the shareholders. Those corporations whose franchises have not expired are thriving enterprises and their success has not been imperiled by the hostility among the shareholders.

■■■■■ We must find a fair method of compensating Orchard for his interests in the seven corporations. The court will order the defendants to provide Orchard the fair value of his interest in the corporation. Such relief is adequate to redress his claim of breach of the fiduciary duty and is necessary to bring the business dealings of the parties to an end.

We note that the defendants argued in their Motion in Limine that such a remedy is unavailable to the plaintiff. Certain enumerated corporate changes allow a dissenting stockholder appraisal rights. 15 Pa. S.A. Section 1515. We agree that this exclusive remedy is defined by statute when the change or plan involves a sale of substantially all the corporate assets (15 Pa. S.A. Section 1311), certain amendments to the corporation's articles of incorporation (15 Pa.S.A. Section 1810) or merger or consolidation of the corporation (15 Pa.S.A. Section 1908). We grant similar relief here that is not proscribed by the statutory framework. Because the legislature has determined that the exclusive remedy for certain corporate acts shall be specifically defined by statute, it does not follow that the remedy is unavailable to redress other problems arising in the corporate setting. We are confronted here with a similar need of finding an adequate method of paying a shareholder for the taking of his property.

Orchard was offered $319,000 for his interest in the six original corporations. His interest in these corporations was 27.5%. The offer amount was based upon the formula used in the buy-out of the Chicago Group. The formula for redemption provided that the Chicago Group was to receive fifty cents for each dollar of gross sales recorded by these stores as of February 28, 1977. The offer amount did not include compensation for Orchard's interest in the Buffalo Road restaurant. Since the Chicago Group had no interest in the Buffalo Road Store, Orchard's interest in it at the time of the buy-out offer was 15%.

We find that the buy-out offer amount represents adequate compensation to Mr. Orchard resulting from the breach of the majority's fiduciary duty. It is adequate as of 1977 as to the six original corporations. Mr. Orchard is entitled to compensation for the Buffalo Road store and for interest to the present on the original amount offered when compensation for the Buffalo Road store is added to it. We will compute the value of Orchard's interest in the Buffalo Road store based upon a ratio of Orchard's percentage ownership in each of the original six corporations to the average amount offered in 1977 for each store. We do so in the interest of finality. Strict employment of the Chicago Group formula would serve to further protract this litigation and require examination of accounts records for the Buffalo Road store. In any event, the computation here is based on the 1977 figures and these were computed by use of the Chicago Group formula.

The average value offered at the rate of 27.5% for each of the six stores is one-sixth of $319,000 or approximately $53,167. This reflects compensation for a 27.5% interest in the value of receipts totalling $354,447 held in each restaurant. We think this figure should be applied to compute Orchard's interest in the Buffalo Road restaurant as well, notwithstanding his lower percentage of ownership. We think this is a fair figure in light of Covelli's failure to disclose that the Chicago Group had no interest in this restaurant. Orchard's interest in the six original restaurants, plus the Buffalo Road store amounts to $372,000. To this is added interest at 6% annum from February 28, 1977 totalling $22,320, (1978); $22,320, (1979); $22,320, (1980); $22,320, (1981); $22,320, (1982); $22,320,

(1983); $22,320, (1984); $7,450 (February 28—July 2, 1984) or $163,690. Interest added to compensation for the seven corporations equals $535,690. We enter judgment in favor of Orchard in this amount. In addition, to the extent any or all of these corporations remain liable for any balance of payment owed the Chicago Group for the original buy-out, this amount will be paid by the defendant.

As an additional matter, we find no basis for liability against Milligan, counsel for the corporation and Covelli, although we find nothing laudable in his conduct. He acted in his capacity as counsel for the corporations and as a member of the board of directors. His services were in response to the needs of the individual corporations and Covelli, and any benefit therefrom inured to them.

The judgment of the court terminates Mr. Orchard's interest in these enterprises and payment pursuant to the judgment shall be made forthwith.