543 So.2d 167 (1989)
Billy L. FOUGHT and Elza Fought
v.
Brady M. MORRIS and Vicksburg Tool and Manufacturing, Inc.
No. 57986.
Supreme Court of Mississippi.
April 19, 1989.
*168 John W. Prewitt, Sr., W. Richard Johnson, Vicksburg, for appellants.
William M. Bost, Jr., Ellis, Braddock, Bost & Robinson, Vicksburg, for appellees.
Before HAWKINS, PRATHER and ANDERSON, JJ.
ANDERSON, Justice, for the Court:

I.
This is an appeal from an action of the Chancery Court of Warren County dismissing a complaint filed by Billy L. Fought (Fought) and Elza Fought against Brady M. Morris (Morris) and Vicksburg Tool and Manufacturing, Inc.
The Foughts assign the following errors on appeal:
1. THE CHANCELLOR ERRED IN FAILING TO FIND A BREACH BY MORRIS OF FIDUCIARY RELATIONSHIP.
2. THE CHANCELLOR ERRED IN FAILING TO FIND THE FOUGHTS' STOCK WAS INTENTIONALLY AND FRAUDULENTLY UNDERVALUED.
3. THE CHANCELLOR ERRED IN FAILING TO ALLOW THE FOUGHTS OTHER ACTUAL AND PUNITIVE DAMAGES.
Finding that Morris breached his fiduciary duty, we reverse and remand the case for further proceedings.

II.
In 1974, Fought and Morris, along with Clayton A. Strong (Strong) and John S. Peyton (Peyton), organized Vicksburg Mold and Die, Inc., for the purpose of designing and manufacturing plastic and metal products, each having twenty-five shares. All four were experienced machinists and employed by the company. Morris was unanimously elected president because of his managerial experience and Fought was elected vice-president.
The shareholders entered into a stock redemption agreement, section two of which provided:
In the event any stockholder should desire to dispose of any of his stock in the Company during his lifetime, he shall first offer to sell all of his stock to the company. The offer shall be based on a price determined in accordance with the provisions of Paragraph 6 hereof. Any share not purchased by the Company within thirty days of receipt of such offer shall be offered to the other stockholders, each of whom shall have the right to purchase such portion of the stock offered for sale as the number of shares owned by him on such date shall bear to the total number of shares owned by all the other stockholders; provided, however, that if any stockholder does not purchase his full proportionate share of the stock, the unaccepted stock may be purchased by the other stockholders. If the offer is not accepted by the Company or the other stockholders within thirty days of receipt thereof, the stockholder desiring to sell his stock shall have the right to sell it to any other person, but should not sell it without giving the Company *169 and the remaining stockholders the right to purchase such stock at a price and on the terms offered by such other person.
In 1979, Strong sold his stock in accordance with the stock redemption agreement to the corporation. Strong's shares were divided equally among the remaining three stockholders, with the exception of one share to each of their spouses.
At the time of Strong's stock sale, the corporation was profitable, but by late 1981 or early 1982, business declined. The shareholders ceased to receive wages from the Company and were given the freedom to seek other employment while maintaining their shareholder status in the corporation. Peyton chose to work at another company, while Fought and Morris remained with the corporation.
In May 1983, Peyton decided to sell his shares in the corporation. It is disputed as to whether or not the sale was at Fought's suggestion. Peyton's sale, however, is what initiated the conflict and dissention between Fought and Morris and consequently led to the lawsuit filed by the Foughts. Peyton's stock was not sold in accordance with the stock redemption agreement. Peyton initially negotiated with Fought's neighbor, "Red" Johnson, at Fought's suggestion. This negotiation, however, was not consummated, and Peyton sold his stock to Morris for the consideration of $4,000, transfer of an insurance policy and release as guarantor from a bank note for the corporation.
The record is undisputed that Morris bypassed the stock redemption agreement in purchasing Peyton's stock. Fought objected to the sale of Peyton's stock, making a counter-offer to purchase his pro-rata share; however, Peyton rejected the counter-offer because Fought would not release him as a guarantor from the bank note.
The chancellor found that Morris wanted all of Peyton's stock while Fought only wanted his pro-rata share of it. The chancellor further found that the Foughts could not complain that the terms of the stock redemption agreement were violated because Peyton and Strong were not made parties to the action. The chancellor concluded, therefore, that (1) there was no legal authority for finding a corporate officer guilty of breach of fiduciary duty for acquiring additional stock in an open scramble between stockholders; (2) there was no evidence that Morris possessed any knowledge unknown to Fought; Morris simply had the financial resources to obtain Peyton's release as personal guarantor on the bank note; and (3) there was no evidence to prove any corporate payment on the bank note which influenced the bank to release Peyton as a guarantor.
The chancellor also found that the Peyton-Morris September letter, dated prior to Peyton's offer to the corporation, was not a final offer and acceptance, but rather a prospective agreement conditioned upon Peyton's satisfaction of the requirements of the stock redemption agreement, after which Morris had a right to purchase the stock.
The chancellor, therefore, concluded that there had been no breach of Morris' fiduciary responsibility and denied all relief prayed for by the Foughts at their cost.

III.
This case involves dissention among shareholders in a close corporation. A close corporation is a business entity with few shareholders, the shares of which are not publicly traded. The Model Statutory Close Corporation Supplement, sub-chapter a, section 3(b), defines it as a corporation having 50 or fewer shareholders. Management typically operates in an informal manner, more akin to a partnership than a corporation. The traditional view that shareholders have no fiduciary duty to each other, and transactions constituting "freeze outs" or "squeeze outs" generally cannot be attacked as a breach of duty of loyalty or good faith to each other, is outmoded. See, O'Neal, Close Corporations, § 8.08 (1987).
In Ross v. Biggs, 206 Miss. 542, 40 So.2d 293 (1949), this Court held that stockholders in a family corporation do not bear toward each other the same relationship of *170 trust and confidence which prevails in partnerships. The Court stated: "A partnership is based almost wholly on the trust and confidence reposed by each partner in the other and the fact of existence of a partnership is one of the evidences of a confidential relationship between the partners." Id. 40 So.2d at 296. While this statement is generally true, it ignores the practical realities of the organization and function of a close corporation which operates as a small business enterprise where the shareholders, directors, and managers often are the same persons.
While this Court has not spoken on this matter since Ross, other jurisdictions have done so. The Supreme Judicial Court of Massachusetts in Donahue v. Rodd Electrotype, 367 Mass. 578, 328 N.E.2d 505 (1975), imposed a "strict good faith standard" upon shareholders in a close corporation because of its resemblance to a partnership. The court stated that standards for the discharge of management and responsibilities of shareholders are substantially the same as standards applicable to partners, and are stricter than standards imposed on shareholders and directors of publicly held corporations. Id. 328 N.E.2d at 515.
In Donahue, supra, the corporation purchased the shares held by the father of the Rodd family which controlled it, without affording Donahue, the major non-family minority shareholder, an opportunity to sell at the same price. This purchase, in effect, merely redistributed the Rodd family interest among its members and Donahue refused to ratify the transaction. The Massachusetts Court considered several aspects of the close corporation, such as: (1) the existence of only a small number of shareholders, (2) the lack of an available ready market for the corporate stock, and (3) the substantial majority stockholder participation in the management, direction and operation of the corporation. Id. 511. The Court then stated, "[s]tockholders in close corporations must discharge their management and stockholder responsibility in conformity with this strict good-faith standard. They may not act out of avarice, expediency, or self-interest in derogation of their duty of loyalty to other stockholders and to the corporation." Id. at 515. See also, Galler v. Galler, 32 Ill.2d 16, 203 N.E.2d 577 (1964).
The Massachusetts courts continued to apply this good faith standard, as in Hallahan v. Haltom Corporation, 7 Mass. App. 68, 385 N.E.2d 1033 (1979), where shares were secretly acquired by an equal owner in an effort to change the balance of power within the corporation. The Court there ordered that the shares be returned to the seller at cost.
The case of Orchard v. Covelli, 590 F. Supp. 1548 (W.D.Penn. 1984), aff'd 802 F.2d 448 (3rd Cir.1986), dealt with a close corporation where the majority shareholders acted unfairly toward the minority in regard to dissolution. Recognizing that the controlling interest owes a duty of loyalty and fairness to minority shareholders, the court stated that where a majority shareholder stands to benefit as a controlling stockholder, the law requires that the majority's action be "intrinsically fair" to the minority interest. Id. at 1556. The Court further stated that the use of the corporate process in the context of mergers designed to discount or remove the participation of the minority interest amounts to self-dealing in that the minority shareholder is denied the right to participate in the benefits of the corporation. Such action is an abuse of the corporate process. (Citations omitted).
The Orchard court also stated that adherence by the majority interest to its fiduciary duty is particularly critical in the context of the closely-held corporation, and recognized the acute vulnerability of minority shareholders in such a corporation. This vulnerability stems from several factors. The majority is able to dictate the manner in which the corporation is run. Shares are not publicly traded so that a fair market for them is seldom available. Dissention makes the minority interest unattractive to a prospective purchaser. Consequently, *171 the minority shareholder can neither profitably leave, nor safely stay with, the corporation. Thus, the only prospective buyer is usually a majority shareholder. Finally, close corporations frequently originate in the context of relationships personal in nature, often undertaken by family members or friends. Thus, the Orchard court went on to hold that
any attempt to squeeze out a minority shareholder must be viewed as a breach of his fiduciary duty . .. such conduct is injurious when the result is the exclusion of the minority shareholders without adequate recompense and it is particularly harmful when carried out with malevolence or indifference. .. . The law recognizes a right to recovery under such circumstances
Id. at 1557.
These decisions evince the evolving awareness by courts of the distinctive characteristics and needs of close corporations. We recognize that often close corporations consist of friends or family members where the directors, officers and shareholders are synonymous. Each contributes his or her capital, skill, experience, and labor to the company. Management and ownership are substantially identical. Each shareholder has an inside view of the company's operations and maintains an element of trust and confidence in each other which is commonly lacking in a large or publicly-held corporation. Persons involved in a close corporation should act, therefore, at all times in good faith toward each other and to the corporation in order to maintain this confidence.
We find the Orchard court rationale and standard more appropriate and therefore, hold that in a close corporation where a majority stockholder stands to benefit as a controlling stockholder, the majority's action must be "intrinsically fair" to the minority interest. Thus, stockholders in close corporations must bear toward each other the same relationship of trust and confidence which prevails in partnerships, rather than resort to statutory defenses. This holding does not mean that directors, executive officers and stockholders are not required to adhere to the corporate statutes; rather, we mean that blind adherence to corporate statutes may not be used to circumvent the corporation's by-laws, charter or various agreements, such as a stock redemption agreement, because of the "intrinsically fair" standard we here adopt today. To the extent that Ross, supra, differs from our holding today, it is overruled.

IV.

DID THE CHANCELLOR ERR IN FAILING TO FIND A BREACH OF FIDUCIARY DUTY?
Dispute exists in the record as to whether Morris and Fought agreed that the corporation could not purchase Peyton's stock. More to the point, however, the record is clear that Fought offered to purchase his pro-rata share and that Morris offered to purchase all of Peyton's shares. The evidence indicates that Morris' intent in offering to purchase all Peyton's shares was to "freeze out" Fought.
As we discussed above, directors and officers of a corporation stand in a fiduciary relationship to the corporation and its stockholders. These duties include exercising the utmost good faith and loyalty in discharge of the corporate office. Gibson v. Manuel, 534 So.2d 199 (Miss. 1988); Ellzey v. Fyr-Pruf, Inc., et al., 376 So.2d 1328, 1332 (Miss. 1979); American Empire Life Ins. Co. v. McAdory, 319 So.2d 237 (Miss. 1975); Cooper v. Mississippi Land Co., 220 So.2d 302 (Miss. 1969); Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So.2d 799 (1956).
Knox Glass, supra, set out the following rule:
Since the directors and other officers of a corporation, whatever their relation *172 may be technically, occupy a fiduciary or quasi trust relation toward the corporation and the stockholders collectively, it is thoroughly well settled that they cannot, either directly or indirectly, in their dealings on behalf of the corporation with others, or in any other transaction in which they are under a duty to guard the interests of the corporation, make any profit, or acquire any other personal benefit or advantage, not also enjoyed by the other stockholders, and, if they do so, they may be compelled to account therefore to the corporation in an appropriate action.
89 So.2d at 814-15 (citing 3 Fletcher, Sec. 884).
The chancellor found that Morris won in the scramble between Fought and Morris for Peyton's stock. However, at the inception of the corporation the four stockholders entered into a Stock Redemption Agreement to prevent such a scramble. Section 2 of the agreement provided in pertinent part that:
In the event that any stockholder should desire to dispose of any of his stock in the Company during his lifetime, he shall first offer to sell all of this stock to the Company... . Any share not purchased by the Company within thirty days after receipt of such offer shall be offered to the other stockholders, each of whom shall have the right to purchase such portion of the stock offered for sale as the number of shares owned by him at such date shall bear to the total number of shares owned by all the other stockholders provided, however, that if any stockholder does not purchase his full proportionate share of the stock, the unaccepted stock may be purchased by the other stockholders.... (Emphasis added).
This agreement insured that stock in the corporation always would be offered to the corporation, or in the alternative, each shareholder would have a right to purchase a pro-rata share.
A Stock Redemption Agreement in one guide for corporate policy, which may restrain the transferability of stock. Shareholders in a close corporation have an interest in maintaining a balance of power that frequently is protected by such agreements. See 2 O'Neal, Close Corporations § 7.05 (1987); Walderbaum, Buy-Sell Agreements, The Practical Accountant 17 (May/June, 1976); Zidell v. Zidell, 277 Or. 423, 560 P.2d 1091, 1094 (1977).
Generally, a director violates no duty by dealing in his own stock on his own account. This rule is not applicable, however, when there is a showing that a closely-held corporation has a practice of purchasing its own stock, or that it ever contemplated doing so, as evidenced by a stock redemption agreement, in order to maintain proportionate control of the corporation. Zidell, 560 P.2d at 1092-93; See, Faraclas v. City Vending Co., 232 Md. 457, 194 A.2d 298 (1963).
In the case sub judice the stockholders had entered into an agreement which constituted corporate policy. This policy was adhered to when Strong sold his stock. However, the record reveals that Morris was unhappy with Fought. When Peyton decided to sell his stock, Morris saw a way to take control, as evidenced by his statement that he would undertake to relieve Peyton from liability on the bank note only if he could purchase all of Peyton's stock.
The court below failed to perceive Morris' fiduciary duty, as an officer and director of Vicksburg Mold and Die, Inc., to conduct his office with prudence and all good fidelity. Morris' intended exclusion of Fought from the purchase of Peyton's shares was a breach of the Stock Redemption Agreement and bylaws, and, therefore, a breach of his fiduciary duty as an officer, a director and a stockholder under the good faith standard we adopt today. See, Gibson, supra. We hold, therefore, that Morris breached his fiduciary duty in purchasing *173 all of Peyton's stock, contrary to the Stock Redemption Agreement.

V.

DID THE CHANCELLOR ERR IN FAILING TO FIND THAT FOUGHT'S STOCK WAS INTENTIONALLY AND FRAUDULENTLY UNDER-VALUED?
After the stock transfer from Peyton to Morris, Fought was fired as an officer and employee, and later resigned his appointment to the Board of Directors. Eventually, the corporation was purchased, through dissolution, by a new corporation, solely owned by Morris. The Foughts claim that they have not been accurately compensated for their shares upon dissolution. The chancellor found that the value reached and amount paid for the corporate assets were not so unreasonable as to give rise to a conclusion of fraud, illegality, oppression or unfairness.
Morris made a determination of the value of the stock by compiling figures previously furnished to an accountant. The CPA for the Foughts testified, without dispute from Morris, that the value of the corporation was higher than that determined by Morris. Morris also reduced the fair market value of the equipment arbitrarily as evidenced by a footnote on the appraisal. Expert evidence presented by the Foughts, also without rebuttal from Morris, revealed that such a reduction was improper.
The record reveals that Morris apparently proceeded inappropriately in valuing Fought's stock. Consequently, the Foughts may not have been offered the fair market value. Section 2 of the Stock Redemption Agreement provides in pertinent part that when stock is sold "the offer shall be based on a price determined in accordance with the provisions of Paragraph 6 hereof." Section 6, however, is not a part of the record. The lower court, upon remand, must make a determination of the stock's fair market value.

VI.

DID THE COURT ERR IN FAILING TO AWARD PUNITIVE DAMAGES?
Punitive damages are recoverable in breach of contract cases "where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort." Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 465-66 (Miss. 1983); Progressive Casualty Ins. Co. v. Keys, 317 So.2d 396, 398 (Miss. 1975). Punitive damages, however, are appropriate "only in extreme cases," Bryant v. Alpha Entertainment Corp., 508 So.2d 1094, 1098 (Miss. 1987); Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985); Tideway, supra, at 460, and should be awarded only with "caution and within narrow limits." Bryant, supra, at 1098; Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 526 (5th Cir.1984) citing Consolidated American Life Ins. Co. v. Toche, 410 So.2d 1303, 1304-05 (Miss. 1982).
Breach of fiduciary duty, among others, is recognized as an "extreme or a special additional circumstance when punitive damages may be awarded." U.S. For Use and Benefit of Control Systems, Inc. v. Arundel Corp., 814 F.2d 193, 199 (5th Cir.1987). See Gardner v. Jones, 464 So.2d 1144, 1148-50 (Miss. 1985). The award of punitive damages and the amount thereof, however, is within the discretion of the trier of fact. McGowan v. Estate of Wright, 524 So.2d 308, 310 (Miss. 1988); South Central Bell v. Epps, 509 So.2d 886 (Miss. 1987).
Thus, the lower court has the authority to award punitive damages at its discretion. Such discretion will not be disturbed by this Court.

CONCLUSION
We find: (1) Morris breached his fiduciary duty as a director, an officer and stockholder *174 by purchasing Peyton's total shares of stock in violation of the stockholders' purchase redemption agreement, (2) the Foughts are entitled to the fair market value of the stock in accordance with paragraph 6 of the stock redemption agreement. Upon remand, the lower court should determine the appropriate relief to which the Foughts are entitled. We reverse and remand for further proceedings in the lower court consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
PITTMAN and BLASS, JJ., not participating.