608 So.2d 1214 (1992)
Arthur FINKELBERG and Merrill Lynch, Pierce, Fenner & Smith, Inc.
v.
Patrick Henry LUCKETT, III.
No. 89-CA-0752.
Supreme Court of Mississippi.
August 19, 1992.
Rehearing Denied December 3, 1992.
*1215 John Edward Hughes, III, Walter D. Willson, Wells Wells Marble & Hurst, Jackson, for appellants.
Crymes G. Pittman, Joseph E. Roberts, Jr., Cothren & Pittman, Jackson, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
This is an appeal by Arthur Finkelberg (Finkelberg) and Merrill Lynch, Pierce, Fenner and Smith, Incorporated (Merrill Lynch), a securities corporation operating world-wide, from a judgment in the chancery court of Rankin County awarding Patrick Henry Luckett, III, damages in the total amount of $1,660,264.50, of which $13,571 was the amount in a joint account which the defendants released to Dr. Luckett's wife; $46,693.56 the amount Dr. Luckett incurred in legal expenses in litigation with Mrs. Luckett; $100,000 an award for mental anguish and anxiety; and $1,500,000 a punitive damages award. Finding no basis in the record for any damages except the withdrawal of $13,571, we affirm the judgment as to Merrill Lynch as to this amount, and as to Arthur Finkelberg we reverse and render.

FACTS
Dr. Luckett, a practicing veterinarian in Rankin County, married Winnie Sue Cook on May 14, 1977; two children were born of their marriage. They lived in Brandon.
On March 4, 1982, the two of them with Dr. Luckett's funds opened a joint account with right of survivorship in the Jackson office of Merrill Lynch, called a Cash Management Account (CMA). On July 25, 1983, they signed a Cash Management Account Agreement detailing the rights of the parties and how the funds would be invested. A CMA is an account in which Merrill Lynch invests funds of the depositor in accordance with his wishes, and also affords him check writing and Visa credit card privileges to the extent of the uninvested balance in the account. The Merrill Lynch representative with whom they dealt was Finkelberg, the company's local broker.
Very few checks were written on this account, these few being by Dr. Luckett in large sums to take care of an investment or purchase. Checks drawn on the account did not clear locally, but through a national exchange of Merrill Lynch located in New Jersey. Approximately 200,000 checks were processed daily through this exchange.
Approximately 4,000 of these daily checks constitute what the company called "exception items." An exception item could be an insufficient balance to cover the check, a check following notice that the depositor had lost his checks, or any reason *1216 causing Merrill Lynch to stop payment. The account would then be "blocked" and no checks honored until the problem was corrected.
There is nothing in the CMA agreement executed by the Lucketts authorizing Merrill Lynch to refuse to honor a check presented for payment by a joint account owner/depositor. Yet Merrill Lynch did have in force a long-standing policy whereby in domestic disputes between a husband and wife Merrill Lynch would block the account and prevent either from withdrawing any funds from the account. The local broker would then notify the joint account owners that the funds could not be withdrawn except upon signature of them both or by court order.
At trial Hollis D. Anderson, manager of the local Merrill Lynch office, testified:
When there is a possibility of Merrill Lynch being used as an instrument of ill-will of one client to another, to protect both clients we require that they both acknowledge that funds are being withdrawn from the account.
(R.141) Under this policy either could order Merrill Lynch to buy or sell securities, but neither could withdraw funds.
Anderson testified the company had this policy in effect when he went to work for it twelve years before.
In June, 1985, Merrill Lynch learned that the Lucketts were involved in a divorce proceeding and blocked the account. Dr. Luckett's attorney, Frank T. Moore, Jr., advised him to withdraw the funds in the CMA and he informed Finkelberg that he wished to do so. Finkelberg told Dr. Luckett of the company policy, and that the account would be frozen so that neither he nor Mrs. Luckett could withdraw the funds pending resolution of the problems between them. Dr. Luckett reported this to Moore. Because Merrill Lynch was not going to permit either party to withdraw funds pending resolution of the marital dispute, Moore saw no particular objection to this arrangement. Dr. Luckett was concerned that Mrs. Luckett not be permitted to withdraw the funds, and was reassured by Finkelberg upon several subsequent occasions that the funds were frozen and would not be released to her.
It was the trial strategy of Dr. Luckett and his counsel to cause Mrs. Luckett monetary problems, and hopefully induce her to reach an agreeable settlement with them. According to them both, during her marriage to Dr. Luckett, she was only a housewife, had no separate funds, and her only properties were a Lincoln car, a half interest in the marital residence, and a half interest in the Merrill Lynch account.
The Jackson office in July, 1985, did notify the national office that the account should be blocked. Corporate headquarters wired the exchange to block the funds, and withdrawals be permitted "only when instructed by the branch office."
Mrs. Luckett had in fact filed a complaint for divorce in the Rankin County Chancery Court in March, 1985. On March 22, 1985, Dr. Luckett filed an answer denying that Mrs. Luckett had ground for divorce, and also filed a counterclaim seeking custody of the children. When the cause was heard on April 15, 1986, the court denied the divorce, but did award Mrs. Luckett custody of the children and $450 per month child support.
On or about April 15, 1986, someone, presumably Mrs. Patricia Cook, mother of Mrs. Luckett, presented a check signed by Mrs. Luckett dated April 3, and payable to Mrs. Cook in the amount of $13,571.00. Because of a misunderstanding between the local office and the national exchange in the transmitted wire, this check was honored by the national exchange.
On April 24, 1986, Anderson wrote Mrs. Luckett the following letter:
On 18 April a check you wrote for the amount of $13,571.00 cleared your account. The account, however, was frozen due to your divorce proceeding. Through a clerical oversight we inadvertently cleared that check.
Mrs. Luckett, this has placed us in an adversarial position with Dr. Luckett as you might understand. The funds, being jointly owned and held should have been released only with joint approval on court *1217 order. It's appropriate that these funds be re-deposited as soon as possible and I hereby request that you do so.
I thank you in advance for your understanding and prompt attention to this matter.
According to Anderson, Dr. Luckett and Moore telephoned him quite upset, not because Dr. Luckett did not have the money, but because it had been released to Mrs. Luckett, thereby upsetting the trial strategy. In the divorce pleadings, Dr. Luckett pleaded that he and Mrs. Luckett each owned a one-half interest in the account.
At sometime during this period, Mrs. Luckett went to Florida with the children. When she got to Florida, she filed a suit against Dr. Luckett for child support, which was later dismissed. Dr. Luckett in Mississippi subsequently filed suit against his wife for divorce on the ground of desertion, and obtained a divorce. According to Moore, Mrs. Luckett filed another suit in Florida for divorce against Dr. Luckett, which was dismissed because Dr. Luckett had obtained a divorce in Mississippi.[1]
On May 19, 1986, Moore wrote Anderson a demand letter for $38,000, for the wrongful release of the funds to Mrs. Luckett.
On May 28, 1986, Jean B. Sinatro, New York house counsel for Merrill Lynch replied:
We reject your request for a $38,000 settlement. Mr. Luckett has failed to indicate how he has been damaged in any manner. Winnie Sue Luckett had as much interest in the account as Patrick Henry Luckett. In addition, it is my understanding they remain married. Thus, any funds removed from Merrill Lynch by Mrs. Luckett, would continue to be part of the marital estate.
Though it is true that Bank One of Columbus, Ohio, did clear the check after Mr. Luckett was advised the bank would fail to honor it, Winnie Sue Luckett had as much right to the funds as your client.
Dr. Luckett thereafter employed additional counsel. His subsequent counsel on December 3, 1986, wrote Sinatro asking her if Merrill Lynch "would like to resolve this matter by settlement," and concluding with the statement: "If I do not hear from your office with ten (10) days of the date of this letter, appropriate action will be taken." Sinatro replied by referring to and enclosing a copy of her previous letter to Moore.
On May 7, 1987, Luckett filed a complaint against Finkelberg and Merrill Lynch alleging that when divorce proceedings were filed by Mrs. Luckett in 1985 and Dr. Luckett had attempted to withdraw the funds, he had not been allowed to do so. The wrongful conduct of the defendants was set forth in paragraph 5 of the complaint:
On or about April 3, 1986, Mrs. Luckett wrote a check on the account in the sum of $13,571. The check was presented for payment on or about April 15, 1986, and Defendants advised Plaintiff that the check would not be honored. Despite assurances by the Defendants to the contrary, the check was allowed to clear resulting in damage to the Plaintiff in the sum of $13,571."
The complaint then demanded $13,571 in actual and $500,000 in punitive damages.[2]
At trial both Dr. Luckett and Moore testified that Mrs. Luckett had no outside funds, was unemployed, and both were of the opinion that without the $13,571 she would have been unable to go to Florida and pursue the Florida litigation. Moore testified that it was his trial strategy that *1218 Mrs. Luckett would become so desperate for money that she would make an agreeable settlement with them. The release of the $13,751 destroyed this strategy, according to him.
Evidence was offered by Moore as to the legal expenses incurred in defending the Florida litigation.
Moore's bill for legal fees and expenses representing Dr. Luckett in the Florida litigation was $31,471.68. He associated Lyman Fletcher, an attorney in Florida, to defend Dr. Luckett against his wife in Florida. Fletcher's fee was $10,247.53. There was also a legal fee to the law firm by McLaurin and McLaurin for $1,501.58 and Alan Winter for $143.55. Dr. Luckett additionally hired investigators in defending his suit against his wife, which totaled $3,329.22.
Dr. Luckett testified that after his wife had left, he had not seen either of his children and did not know whether they were living or dead. The subsequent Mississippi divorce decree had awarded him custody of the children.
Asked how he had been damaged by his wife going to Florida, Dr. Luckett testified:
I entered into a professional agreement with a well-known savings and loan association stock firm with Merrill Lynch, Artie Finkelberg and I gave them my life savings and I trusted them to take this money and to use it to help me make money and for them to make money.
I was intentionally told that I could not get the money when I went to get it when, in fact, I went to the lawyer, I was able to get the money. I guess the most important way that I've been harmed is I've been without my children for two years. It's been a very difficult time and 
The only witnesses testifying on behalf of Dr. Luckett at trial were himself and Moore. Finkelberg was called by Dr. Luckett as an adverse witness.
The chancellor's opinion held that Merrill Lynch had no authority to freeze the account, but should have paid the funds to Dr. Luckett on demand, and that the decision to do so was for the "benefit of Merrill Lynch and not for the benefit of the Lucketts." He found that Mrs. Luckett had taken the funds, fled the state and secreted the children of the parties from Dr. Luckett, and that Dr. Luckett testified "that he had suffered much anguish and grief." The opinion recited that Dr. Luckett had spent $46,693.56 in legal expenses defending the legal action in Florida in which Mrs. Luckett had been unsuccessful. He found that the defendants "attempted to stand in the place of Mrs. Luckett in her divorce case, in defending the suit at bar," by contending that she was just as entitled to the funds as he, or at least one-half. The court held: "The testimony of such witnesses however, and the exhibits allowed in this case, do not bear this out."
In his conclusions of law, the court found that Merrill Lynch occupied a fiduciary relation with the Lucketts, and had violated this trust. He found that Dr. Luckett was entitled to $46,639.56 for the legal expenses spent in his defense of the actions by Mrs. Luckett, $100,000 for the "mental anguish and anxiety" he had suffered, and because of the "gross negligence, evincing a ruthless disregard for the rights of Dr. Luckett," an award of punitive damages. He awarded $1,500,000 in punitive damages, in addition to the other damage awards.
The final judgment, as first noted, awarded:
(a) The sum of $13,570 being the amount of money wrongfully withheld from Plaintiff by Defendants;
(b) The sum of $46,693.56 being the expenses incurred by Plaintiff;
(c) The sum of $100,000 for the mental anguish and anxiety suffered by Plaintiff; and
(d) The sum of $1,500,000 in punitive damages, for a total amount of $1,660,264.56.
Finkelberg and Merrill Lynch have appealed.

LAW

I. FINKELBERG
As to Finkelberg there is nothing in this record showing any act or failure to *1219 act by him which caused or contributed to any damage to Dr. Luckett, and judgment as to him should be reversed and rendered.

II. PUNITIVE DAMAGES
In this case Merrill Lynch informed Dr. Luckett that he would not be permitted to withdraw the joint account funds and neither would Mrs. Luckett. Merrill Lynch's decision to block withdrawal of the funds was clearly deliberate. Dr. Luckett, relying on the assurance that neither he nor his wife acting alone could withdraw the funds, was content.
Mrs. Luckett did not simply inquire if she could withdraw funds. She wrote a check to her mother, Mrs. Cook, which in fact was presented to the local office for payment. Through a mistake in inter-departmental communications on the part of Merrill Lynch the check was honored and the funds released. The record does not disclose who in fact presented the check, but presumably it was Mrs. Cook, the payee.
The act of blocking the funds was intentional, the release was inadvertent. The wrong to Dr. Luckett was, after telling him the $13,571 would be frozen and neither he nor Mrs. Luckett could on his or her own withdraw any of it, thereafter releasing the funds on the check of Mrs. Luckett to Mrs. Cook.
No explanation was offered by any Merrill Lynch witness why it had in effect a policy refusing to honor a withdrawal of funds by one joint tenant when he and the other joint tenant were involved in a dispute which was none of Merrill Lynch's business. The CMA executed by the parties gave Merrill Lynch no such right. In its brief Merrill Lynch has cited us New York authorities to support its claim of a right to freeze the account which we find unpersuasive. McKinney, New York Banking Laws, § 651(a) (1971); Caruso v. Dry Dock Savings, 11 N.Y.S.2d 411, 170 Misc. 867 (Sup.Ct. 1939).
Merrill Lynch does tell us there was a sound basis for its policy, citing Wood v. Jack Carl Associates, 782 F.2d 83 (7th Cir.1986), and Leuzinger v. Merrill Lynch, Pierce, Fenner and Smith, 396 S.W.2d 570 (Mo. 1965).
In Leuzinger the broker, Merrill Lynch, and a state bank in Missouri were sued for doing precisely opposite what occurred here, permitting withdrawal of all funds from a joint account by a husband, who then absconded. The Missouri Supreme Court first held that a stockbroker is a trustee and owes a fiduciary duty to its customers, which includes "the duty of keeping the customer fully informed of all facts pertinent to the transaction." 396 So.2d at 575-76. The Court further held:
If the stockbroker knows of facts and circumstances which would lead an ordinarily careful and diligent person to believe that one joint tenant of a joint brokerage account was in the process of wrongfully converting to his own uses and purposes the interest of the other joint tenant, a duty to inform the latter would arise, and in such case the broker would be derelict in disbursing the whole account to the joint tenant under suspicion, without first informing the other and obtaining consent and approval to the disbursement.
396 S.W.2d at 567. The Court went on to hold, however, that since there had been nothing said or done by either the account owners to arouse any suspicion on the part of Merrill Lynch, there was no liability. 396 S.W.2d at 577. In Wood v. Jack Carl Associates, the court of appeals for the Seventh Circuit expressed no view on this question as to a broker's common law duty, confining itself to the interpretation of an Illinois statute.
We have no need in this case to decide whether or not to follow the rule announced in Leuzinger, reserving that for the day the precise question is presented to us. The law pronounced in that decision did, however, give Merrill Lynch some legal and sound business basis for its policy, and this does have a bearing on whether the policy of blocking funds in a case such as this in and of itself should subject Merrill Lynch to punitive damages.
Moreover, it was not the refusal to release the $13,571 to Dr. Luckett in and of *1220 itself which gave rise to his complaint. It was the act of freezing the account, coupled with the assurance to him that he and Mrs. Luckett would be treated exactly alike, and thereafter releasing the funds on her check alone which brought about the complaint.
Merrill Lynch cannot, as its house counsel Sinatro asserted, have it both ways. If it had no legal right to withhold the funds when Dr. Luckett wanted to withdraw them, then it should not have told him it was doing so. On the other hand, if it did in fact have some right or responsibility to put some kind of freeze on the account, which as noted, we do not address in this case, then manifestly, Mrs. Luckett should have been treated in precisely the same way as Dr. Luckett, and Merrill Lynch had no right to release the $13,571 on her check. By no stretch of legal reasoning could Merrill Lynch be considered as having any legal right to treat these two individuals differently.
Merrill Lynch exceeded its legal authority in its conduct with Dr. Luckett and damaged him.
The question is whether or not this was conduct which justified the assessment of punitive damages. We conclude that it was not. There was some rational justification for the policy of Merrill Lynch to place some kind of freeze on a joint account when it received notice that the owners had become hostile to each other. Leuzinger. On the other hand, the release of the funds on Mrs. Luckett's check was unintentional, a mistake, and did not constitute conduct or that degree of negligence which justifies the imposition of punitive damages.
Application of punitive damage "principles are not ironclad." Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1185 (Miss. 1990). Whether a particular act or conduct justifies assessment of punitive damages "cannot come from a precise formula, but rather must come from the trial judge's life experience." South Central Bell v. Epps, 509 So.2d 886, 893 (Miss. 1987); Fedders v. Boatright, 493 So.2d 301, 311 (Miss. 1986). Nevertheless, as we held in A & S Trucking v. First General Insurance, 578 So.2d 1212, 1215 (Miss. 1990), the "highway we travel in deciding bad faith (punitive damage) cases is a well marked one." Mutual Life Ins. v. Estate of Wesson, 517 So.2d 521, 527 (Miss. 1987) We do have familiar principles, expressed in South Central Bell v. Epps, a case in which we denied punitive damages where the telephone company wrongfully disconnected the plaintiff's telephone service. Although we found the defendant company's disconnection of this elderly plaintiff's service "inept" and even "deplorable," we nevertheless found it did not give rise to punitive damage liability.
IS THIS CASE APPROPRIATE FOR PUNITIVE DAMAGES?
As a general rule, exemplary or punitive damages are not ordinarily recoverable in actions for breach of contract. However, in Progressive Casualty Ins. Co. v. Keyes, 317 So.2d 396 (Miss. 1975), we recognized that:
(b) Punitive damages are not recoverable for breach of contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort. (Citations omitted).
However, there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases. Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985); Tideway Oil Programs, Inc. v., Serio, 431 So.2d 454, 460 (Miss. 1983). Accordingly, we have repeatedly held:
In order to warrant the recovery of punitive damages, there must enter into the injuries some element of aggression or some coloring of insult, malice, or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule. (Citations omitted)
Furthermore, any plaintiff seeking to recover punitive or special damages carries a heavy burden. Cf. Blue Cross & Blue Shield of Miss., Inc. v. Campbell, 466 So.2d 833, 842 (Miss. 1984) (plaintiff asking for punitive damages in "bad faith" case has heavy burden).

*1221 ... .
[W]e find that the facts simply do not justify submitting an issue of punitive damages to the jury. Certainly, Bell's employees wrongfully terminated Mrs. Epps' telephone services. In doing so, they erroneously relied on faulty records regarding the account. However, their actions are more the product of oversight, inadvertence, or incompetence rather than the product of gross, callous or wanton conduct manifesting a reckless indifference to the consequences of their act or the rights of their subscribers. See State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985). There is no evidence to indicate that Bell's employees acted maliciously or with some deliberate design to cause Mrs. Epps harm. Further we cannot say that Bell's misconduct constituted gross negligence so as to bring this case out of the ordinary rule and warrant submitting the issue of punitive damages to the jury.
... .
In conclusion, we find that this was not a punitive damage case. There is no evidence to indicate that Bell was engaged in any deceptive or fraudulent practices. Nor can we say that their breach of the subscribers' contract was attended by such gross negligence or willful wrong so as to constitute an independent tort necessary to impose punitive damages. Although we are convinced that the disconnection was a result of employee incompetence, incompetence alone does not meet our criteria for the imposition of punitive damages.
509 So.2d at 892-894.
South Central Bell v. Epps is dispositive of the punitive damage claim in this case. There was no fraud or deceit in Merrill Lynch's conduct, nor was it seeking any monetary gain. We neither characterize its policy of blocking withdrawal of funds when the joint account owners were involved in a dispute wise nor unwise, but it was a policy that tried to protect both joint tenants, and keep from being sued itself for the wrongful release of funds. Leuzinger. This was not a policy that suggests, at least under the facts of this case, that there should be any punitive damage liability.
Releasing the funds upon Mrs. Luckett's check was an act of negligence in which no greed, avarice or oppression was involved, and clearly was not the degree of negligence which would give rise to punitive damage liability.

III. DAMAGES FOR MENTAL ANGUISH
The chancellor manifestly erred in awarding damages for mental anguish. The only proof offered here was the statement by Dr. Luckett was that he had "been without his children for two years."
The first hurdle in attempting to establish liability for mental anguish resulting from an act of simple negligence is foreseeability. "[T]he actor is not bound to a prevision or anticipation which would include an unusual, improbable, or extraordinary occurrence, although such happening is within the range of possibilities." Mauney v. Gulf Refining Co., 193 Miss. 421, 428, 9 So.2d 780, 781 (1942); Sears Roebuck & Co. v. Devers, 405 So.2d 898, 902 (Miss. 1981) (requiring that the test of "reasonable foreseeability is also satisfactorily met.") Louisville and N.R. Co. v. Blair, 154 Miss. 680, 123 So. 859 (1929).
The coup de grace on any claim for damages for mental anguish in this record, however, is the total absence of proof justifying it. In the seminal case of Sears Roebuck & Co. v. Devers, we held that in a case of simple negligence damages for mental anguish unaccompanied by physical injury would be upheld only "if there is a resulting physical illness or assault upon the mind, personality or nervous system of the plaintiff which is medically cognizable and which requires or necessitates treatment by the medical profession." 405 So.2d at 902. Quoted with approval in Wirtz v. Switzer, 586 So.2d 775, 784 (Miss. 1991).
In the recent case of Strickland v. Rossini, 589 So.2d 1268 (Miss. 1991), involving the purchase of a seriously defective residence, *1222 and in which there was considerably more proof of depression, anxiety, and stress than in this case, we held that the plaintiff had not made a jury issue on her claim for damages for mental anguish.
No damages should have been awarded for mental anguish.

IV. LEGAL AND LITIGATION EXPENSES
The chancellor awarded Dr. Luckett $46,693.56 in damages for the expense he had gone to in defending the actions of Mrs. Luckett in the Florida state court. On this issue, there was competent proof which was not contradicted that Dr. Luckett had paid large sums of money to his attorneys for the litigation in Florida. There was proof of damages, but again there is the question of foreseeability. Mauney v. Gulf Refining Co. We do not have to decide the nebulous question of whether or not these expenses were reasonably foreseeable by Merrill Lynch, however, because Dr. Luckett failed to prove that Merrill Lynch's conduct did in fact cause or was a contributing factor in causing Mrs. Luckett to move to Florida and file suit against him.
The following facts are established from the record:
1. Mrs. Luckett made out a check payable to her mother, Mrs. Patricia Cook, in the amount of $13,571, which somebody cashed.
2. Mrs. Luckett in this time period went to Florida with her two children.
3. Mrs. Luckett filed one or more lawsuits in Florida against her husband, which were later dismissed.
4. Dr. Luckett spent $46,693.56 in lawyers' fees in this litigation with Mrs. Luckett.
Neither Mrs. Cook nor Mrs. Luckett testified in this case.[3]
While it may very well be true that Mrs. Cook cashed the check, gave the money to her daughter, Mrs. Luckett, and the daughter used it to travel to Florida and filed suits against Dr. Luckett, there is no proof but that Mrs. Luckett would have done precisely the same thing if the funds had remained on deposit with Merrill Lynch. Dr. Luckett was required to prove with some reasonable certainty that Merrill Lynch's release of the funds did in fact cause this harm to Dr. Luckett. Not only must we resort to sure speculation as to whether nor not Mrs. Luckett's plans were affected by her mother's cashing of the check, we do not even know that Mrs. Cook did in fact deliver the money to her daughter.
As a general rule, damages which are uncertain, contingent or speculative are not recoverable. Ordinarily, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made, or some other cause.
Hudson v. Farrish Gravel Company, Inc., 279 So.2d 630, 636 (Miss. 1973).
25 C.J.S. Damages, § 27, p. 684 states the general rule as to the proof required in proving that the defendant's conduct in fact caused the damage:

Uncertainty as to cause. Where it is not shown with reasonable certainty that the harm or loss resulted from the act complained of, there can be no recovery of compensatory damages therefor.[4]
*1223 Restatement (Second) of Torts, § 912 comment (a) (1979), states:
When one seeks to recover damages for a particular harm that he claims has resulted to his person or to a tangible thing belonging to him, he has the burden of proving that the other has invaded a legally protected interest of his, that he has suffered the harm and that the act of the other was a legal cause of the harm. Thus when a person has been wounded by another and subsequently blood poisoning develops in any portion of his body, he has the burden of showing that it is more probable than not that the initial wrongful contact was a substantial factor in producing the malady. So when one has been libeled and seeks to prove as a basis for special damages the loss of a particular marriage, he has the burden of establishing that the publication of the libel was a substantial factor in preventing the marriage. In all of these cases the recovery of damages for a particular harm is dependent upon proof that the harm occurred as the result of the tortious conduct, and normally the plaintiff can recover damages for the harm only by proving this with the same degree of certainty as that required in proving the existence of the cause of action. (Emphasis added)
Sedgwick on Damages § 170 (1912) on proving damages with reasonable certainty:
He is to show, with that reasonable certainty required by law, the nature and extent of the loss for which he is entitled to compensation; and no recovery can be had for any damage which is not satisfactorily proved by the evidence.
... .
On this ground no recovery can be had upon a loss which is insufficiently proved to have been actually suffered. So in an action where it appeared that defendant destroyed a hose connected with a fire engine by means of which an attempt was being made to put out a fire on plaintiff's premises, plaintiff claimed to recover the value of his property burned, on the ground that if the hose had not been destroyed the fire would have been extinguished; but this was held too conjectural. So where a performance of the duty would have given the plaintiff an opportunity to make a contract, or special use of property, without any certainty that he would have chosen to do so, no loss is sufficiently proved. And wherever the fact of loss depends upon whether defendant would have chosen or will in future choose to act in a certain way, it is not sufficiently proved. A fortiori if the occurrence of the loss depends upon a future exercise of choice by a third party, it is not usually provable with sufficient certainty... . (footnotes omitted)
Also, Crommelin v. Montgomery Independent Telecasters, Inc., 280 Ala. 391, 194 So.2d 548, 551 (1967) (refusal of television station to permit plaintiff to make broadcast he had paid for did not entitle him to damages for loss of race). "A political campaign is inherently an adventure. Resort to pure speculation would have to be indulged to conclude that the breach of contract complained of caused the plaintiff's loss of the political races." Id., 194 So.2d at 551.
The chancellor erred in awarding Dr. Luckett damages for litigation expenses.

V. THE $13,571
Merrill Lynch contends that Dr. and Mrs. Luckett were presumed to be equal owners in the joint account and therefore the chancellor erred in awarding him the entire amount withdrawn on Mrs. Luckett's check, citing Reeves v. Reeves, 410 So.2d 1300, 1303 (Miss. 1982). While it is correct that in the absence of proof to the contrary, joint account owners are presumed to have equal ownership of the account, this misses the point in this case.
The CMA drafted by Merrill Lynch, no doubt by well paid counsel, conspicuously fails to mention its policy of blocking withdrawal *1224 of funds when the account owners are in a dispute, and fails to give this company any right to withhold funds as it did in this case. For reasons neither given at trial nor on appeal, Merrill Lynch chose to omit any such provision from its CMA. When Dr. Luckett asked about withdrawing the funds from the account, he had a clear legal right to withdraw the entire amount, not just part of it. In re Lewis' Estate, 194 Miss. 480, 487, 13 So.2d 20, 25 (1943). Without Merrill Lynch's intervention, Dr. Luckett would have withdrawn for himself the entire $13,571, and Merrill Lynch had no obligation or right to trace the funds following withdrawal to see whether or not Mrs. Luckett received any part of it.
Having prevented Dr. Luckett from withdrawing the entire amount, Merrill Lynch thereafter had a fiduciary obligation to Dr. Luckett to hold these funds in trust for his protection. By its own admitted negligence, Merrill Lynch permitted Mrs. Luckett to withdraw the entire amount.
It is drawing too fine a bead for Merrill Lynch to argue that, following its refusal to permit Dr. Luckett to withdraw the entire amount as he had a legal right to do, and letting it all go on Mrs. Luckett's check, that nevertheless it only owed Dr. Luckett one-half of the account. Having been prevented from withdrawing the entire amount in June, 1985, Dr. Luckett was entitled to recover this sum plus legal interest from Merrill Lynch at trial in May, 1988.
The chancery court judgment for $13,571 actual damages is therefore affirmed.
As to all remaining damages, the judgment is reversed and judgment entered here for Merrill Lynch, and as to Arthur Finkelberg, the judgment is reversed and rendered.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
ROY NOBLE LEE, C.J., and ROBERTSON and BANKS, JJ., concur.
DAN M. LEE, P.J., concurs in parts II, III, IV and V and dissents to part I with separate written opinion.
BANKS, J., concurs with separate written opinion.
McRAE, J., concurs in part and dissents in part with separate written opinion joined by PITTMAN, J., DAN M. LEE, P.J., joins in part I, BANKS, J., joins in part III, and SULLIVAN, J., concurs with McRAE, J., with separate written opinion.
PRATHER, J., not participating.
DAN M. LEE, Presiding Justice, concurring in part and dissenting in part:
I concur in Parts II, III, IV and V of the opinion by Presiding Justice Hawkins; however, I cannot join as to Part I concerning the non-individual liability of Merrill Lynch's agent/broker that handled Dr. Luckett's account.
Accordingly, I join that part of Justice McRae's dissent as to the individual liability of Arthur Finkelberg.
BANKS, Justice, concurring:
I concur with the result reached by the majority, but as to damages for mental anguish, I would reach that result for the reasons stated by Justice McRae.
McRAE, Justice, concurring in part and dissenting in part:
Merrill Lynch, through its agent, Arthur Finkelberg, deliberately and intentionally refused Dr. Luckett's request to withdraw funds from the account he held jointly with his wife. As the majority admits, Merrill Lynch had no contractual right whatsoever to withhold Dr. Luckett's money. This willful breach of contract entitles Luckett not only to the money he lost when Merrill Lynch wrongfully paid the account balance to Dr. Luckett's wife, but also to punitive damages for the defendants' bad faith failure to abide by the terms of the CMA agreement.

I.
As to defendant Arthur Finkelberg, the majority states that "there is nothing in *1225 this record showing any act or failure to act by him which caused or contributed to any damage to Dr. Luckett, and judgment as to him should be reversed and rendered." To the contrary, the record clearly establishes that as Merrill Lynch's local broker, Finkelberg personally attended to the Lucketts' account. It was he who told Dr. Luckett that he could not withdraw any funds from the CMA account. It was he who repeatedly assured Dr. Luckett that the funds were frozen and would not be released to Mrs. Luckett. Because of his reckless disregard for the rights of Dr. Luckett, I would find Finkelberg jointly liable with defendant Dr. Luckett, I would find Finkelberg jointly liable with defendant Merrill Lynch. Bass v. California Life Ins. Co., 581 So.2d 1087 (Miss. 1991); Dunn v. State Farm Fire & Casualty Co., 711 F. Supp. 1359 (N.D.Miss. 1987).

II.
The majority holds that punitive damages are inappropriate because (1) Merrill Lynch had "some rational justification [based on Leuzinger v. Merrill Lynch, 396 S.W.2d 570 (Mo. 1965)] for the policy" of freezing the accounts of feuding co-tenants, and (2) the release of funds to Mrs. Luckett was unintentional. This analysis is entirely misplaced. First, Merrill Lynch had no rational justification whatsoever, Leuzinger notwithstanding, for breaching its contract with Dr. Luckett. Had this been an insurance company, we would have allowed punitive damages for such a breach. See Standard Life Ins. Co. v. Veal, 354 So.2d 239 (Miss. 1978). It is true that the Missouri Court in Leuzinger extolled the prudence of freezing the accounts of quarrelling joint tenants. But if Merrill Lynch had thought it wise or expedient to adopt such a policy, it could have incorporated such terms into its CMA agreement. Despite the passage of twenty years since the Leuzinger decision, Merrill Lynch never saw fit to include such a term. As the majority observes, "[t]he CMA drafted by Merrill Lynch, no doubt by well paid counsel, conspicuously fails to mention its policy of blocking withdrawal of funds when the account owners are in a dispute." The contract entered between Merrill Lynch and the Lucketts allowed either of the tenants to withdraw funds upon demand. The motive for withdrawal is not addressed by the contract and is thus irrelevant. When the defendants' refused Dr. Luckett's request to withdraw funds, they committed an intentional act which the CMA contract does not authorize. According to Fought v. Morris, 543 So.2d 167, 173 (Miss. 1989), "Punitive damages are recoverable in breach of contract cases where such breach is attended by intentional wrong." See also Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 465-66 (Miss. 1983); Progressive Casualty Ins. Co. v. Keys, 317 So.2d 396, 398 (Miss. 1975). Merrill Lynch, in this regard, is no different from an insurance company. All are the "invisible bankers." The Luckett's money, like that of all account holders, was pulled into one account to be used by Merrill Lynch. Thus, Merrill Lynch benefitted from refusing to disburse funds to Mr. Lynch. They were able to use it for profit so long as they held it.
Punitive damages are additionally appropriate on grounds that Merrill Lynch's actions constituted a breach of fiduciary duty to Dr. Luckett. It is axiomatic that a fiduciary relationship exists between an investor and his broker. Puckett v. Rufenacht, Bromagen & Hertz, Inc., 587 So.2d 273 (Miss. 1991); Smith v. H.C. Bailey Companies, 477 So.2d 224 (Miss. 1985); Tuttle v. State, 252 Miss. 733, 174 So.2d 345 (1965). Fought recognizes "breach of fiduciary duty" as an "extreme or a special additional circumstance" which, in connection with a breach of contract, justifies the imputation of punitive damages. Fought, 543 So.2d at 173. In the instant case, Merrill Lynch breached its fiduciary duty to Dr. Luckett not only by refusing to allow him to make a withdrawal but also by disbursing funds to Mrs. Luckett after promising Dr. Luckett otherwise. The brokerage firm's transgression was thus two-fold. First, it intentionally and unjustifiably breached its CMA agreement by refusing to disburse funds to Dr. Luckett, following a policy that was neither part of the agreement nor otherwise revealed to its investors. *1226 Second, its breach of its fiduciary duty to Dr. Luckett was compounded by disbursing funds to Mrs. Luckett. The breach of contract in conjunction with the breach of fiduciary duty fully warrants the trial court's award of punitive damages.
It may well be, as Merrill Lynch insists, that the breach of fiduciary duty was unintentional. Merrill Lynch's breach of fiduciary duty, intentional or not, is merely the "extreme or special additional circumstance" which makes punitive damages fully appropriate. Where a breach of contract occurs, punitive damages are in order "where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort." Fought, 543 So.2d at 173; Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 465-66 (Miss. 1983). The conjunctive "or" clearly means that a court is justified in imposing punitive damages where a breach of contract is either intentional or abusive to the rights of the injured party. Thus, where a breach of contract amounts to an abuse of fiduciary duty, the breach need not be intentional in order to merit punitive damages.

III.
Regarding the award of consequential damages for mental anguish and legal fees, the majority is correct in granting a reversal. I disagree in part with the majority's reasoning, however. According to the majority, Dr. Luckett's evidence of mental anguish is insufficient to establish either injury or causation. I join the majority in holding that the record contains insufficient evidence to prove that the defendants' conduct proximately caused Dr. Luckett's mental anguish; however, I do not join the majority in concluding that Dr. Luckett failed to established the existence of an injury. In finding that Dr. Luckett failed to prove that he suffered mental injury, the majority states that in a case of "simple negligence," the plaintiff must prove that his mental affliction is "medically cognizable" and such that "requires or necessitates treatment by the medical profession." This announcement is inapposite for two reasons. First, our caselaw clearly holds that an outward manifestation of mental anguish need not be proven, even in a case involving "simple negligence," so long as the mental injury is a natural and reasonably foreseeable consequence of the wrongful act. See Sears, Roebuck & Co. v. Devers, 405 So.2d 898 (Miss. 1981); First National Bank v. Langley, 314 So.2d 324 (Miss. 1975). Secondly, we are dealing here with the intentional, independent tort of bad faith breach of contract and not, as the majority believes, with a case of "simple negligence." Even prior to Devers and Langley, this Court consistently held that a plaintiff alleging mental distress arising out of an intentional wrong need not prove an outward manifestation of the anxiety. See Daniels v. Adkins Protective Serv., Inc., 247 So.2d 710 (Miss. 1971); Continental Casualty Co. v. Garrett, 173 Miss. 676, 161 So. 753 (1935); accord Universal Life Ins. Co. v. Veasley, ___ So.2d ___, No. 07-CA-59316 (1992) (not-yet-published opinion). Dr. Luckett testified that he suffered serious mental distress as a result of his wife's taking the children to Florida and concealing their location. I would hold that the chancellor did not manifestly err in finding that Dr. Luckett suffered mental anguish.
Unfortunately for Dr. Luckett, however, his proof does not show that the disappearance of his children was a natural and foreseeable consequence of the defendants' refusal to abide by the terms of its CMA agreement. It is true, as Dr. Luckett asserts, that the inadvertent release of funds to Mrs. Luckett would never have occurred if the defendants had honored Dr. Luckett's earlier withdrawal request. It is possible that Mrs. Luckett would have been unable to go to Florida without withdrawing funds from the Merrill Lynch account. It is also possible that Dr. Luckett would not have lost track of the children's whereabouts had Mrs. Luckett been unable to go to Florida. However, the connection between the defendants' refusal to release funds to Dr. Luckett and Dr. Luckett's anxiety concerning his children is tenuous and speculative at best. By no stretch of the imagination was his mental distress a natural and reasonably foreseeable consequence of the defendants' wrongful act. A plaintiff cannot recover for an injury which *1227 the defendant did not proximately cause. The chancellor erred, therefore, in finding the defendants' liable for the infliction of mental anguish.
Similarly, I agree that the chancellor erred in allowing Dr. Luckett to recover the legal fees he expended in defending against the suits Mrs. Luckett filed in Florida. As with his claim for mental anguish, Dr. Luckett has not proven that these expenses were proximately caused by the defendants.

IV.
I would affirm the chancellor's award of $13,571 in actual damages and would grant punitive damages. I would reverse the $100,000 award for mental anguish and the $46,693.56 award for litigation expenses.
PITTMAN, J., joins this opinion.
SULLIVAN, J., concurs with separate written opinion.
DAN M. LEE, P.J., joins part I.
BANKS, J., joins part III.
SULLIVAN, Justice, concurring:
I concur with Justice McRae in his Concurring in Part and Dissenting in Part Opinion except I would reduce the award of punitive damages to $250,000.00.
NOTES
[1] None of the court records of the Florida litigation was introduced into evidence.
[2] Pursuant to court order permitting it, the complaint on May 18, 1988, was amended whereby the last sentence in paragraph 5 was amended to read: "Despite assurances to the contrary, the check was allowed to clear resulting in damage to Plaintiff in the sum of $100,000." The ad damnum paragraph was amended to demand $100,000 in actual and $500,000 in punitive damages.

The chancellor's opinion signed July 14, 1988, awarded punitive damages in the amount of $1,500,000 and on July 18 Dr. Luckett's counsel moved to amend the amended complaint, alleging that the demand for $500,000 punitive damages was clerical error, that the plaintiff intended to demand $5,000,000 in punitive damages.
[3] Dr. Luckett had at the time also filed a suit against Mrs. Cook.
[4] While we are not called upon to do so in this case, it is well to bear in mind the distinction between the certainty required in proving causation in damages and that required in proving the amount of damages. Again, C.J.S. accurately states the latter rule and the distinction in the two:

§ 28  Uncertainty as to Measure or Extent.
Uncertainty as to the measure or extent of damages does not bar recovery. [headnote]
The rule as to the recovery of uncertain damages generally has been directed against uncertainty as to the fact or cause of damage rather than uncertainty as to the measure or extent. In other words, the rule against uncertain or contingent damages applies only to such damages as are not the certain results of the wrong, and not to such as are the certain results but uncertain in amount. (Emphasis added)
Also, 22 Am.Jur.2d Damages, § 488; Billups Petroleum Co. v. Hardin's Bakeries Corp., 217 Miss. 24, 63 So.2d 543 (1953), suggestion of error overruled, 217 Miss. 24, 64 So.2d 764; Burnham v. Joseph, 482 So.2d 1151, 1153 (Miss. 1986); R & S Development, Inc. v. Wilson, 534 So.2d 1008, 1012 (Miss. 1988).