# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-02000-COA

ANNIE MASON                                                           APPELLANT

v.

SOUTHERN MORTGAGE COMPANY                                             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/03/1999 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| COURT FROM WHICH APPEALED: | BENTON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES D. MINOR |
| ATTORNEY FOR APPELLEE: | B. SEAN AKINS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| TRIAL COURT DISPOSITION: | JUDGMENT FOR APPELLEE FOR $24,883.12. |
| DISPOSITION: | AFFIRMED - 5/8/2001 |
| MOTION FOR REHEARING FILED: | 5/23/01 - DENIED; DISSENT MODIFIED - 10/16/2001 |
| CERTIORARI FILED: | 10/30/2001; granted 1/31/2002 |
| MANDATE ISSUED: | |

EN BANC.

McMILLIN, C.J., FOR THE COURT:

¶1. Annie Mason has appealed from a judgment in the Chancery Court of Benton County that purported to resolve a dispute between Mason and Southern Mortgage Company regarding a loan in the amount of $54,400 to be secured by a deed of trust on Mason's residence. We affirm the judgment.

## I.

### Facts

¶2. Mason applied for a loan from Southern Mortgage in the amount of $54,400, the purpose of which was to pay off her existing home loan with First South Bank in the amount of $24,658.34 and to provide extra funds for a number of other purposes, including some contemplated home improvements. Mason, pursuant to instructions from Southern Mortgage, appeared in the company's office on January 29, 1999, where she signed a number of loan instruments that included a promissory note and a deed of trust on her residence. In addition to these documents, Mason signed a disbursement sheet that authorized Southern Mortgage to make certain disbursements of the loan proceeds that included the payoff to First South Bank and $224.78 to the Benton County Tax Collector to satisfy ad valorem taxes on the property that were due.

¶3. Because the loan was to be secured by a non-purchase-money deed of trust on Mason's homeplace, the transaction was subject to federal law that permitted Mason a three day right of rescission. Therefore, no loan funds were disbursed on January 29, 1999. Rather, Mason executed a document entitled "Conditions of Funding" indicating that, if the right of rescission were not exercised, the loan funds would be available for disbursement on February 3, 1999. This "Conditions of Funding" instrument further provided that loan fund disbursement was subject to Southern Mortgage receiving "a written property appraisal in an amount and of a character which is adequate as determined by Lender in its sole discretion . . . ."

¶4. Mason testified that she did not hear from Southern Mortgage on February 3 and that when she called shortly thereafter to check on the status of her loan, she was told that the loan had not yet been funded because of a problem with the appraisal that was in the process of being straightened out. According to Mason, she inquired again about a week later and was told that, because of the value of her property shown on the appraisal, she would not be eligible for a loan in the full amount of $54,400, but that if she wanted a loan in some unspecified lower amount, she could come back to the office and sign some additional loan papers. At that point, Mason said she informed Southern Mortgage that she did not desire to pursue a loan in a lesser amount than that indicated in the January 29 loan documents.

¶5. Unknown to Mason or to the Southern Mortgage representative with whom she was dealing, the closing attorney who had been holding the various disbursement checks in escrow mistakenly made two of the disbursements on or shortly after February 3 and forwarded the deed of trust for filing with the Benton County Chancery Clerk. The two disbursements were the payment to First South Bank of $24,658.34 and the Benton County Tax Collector of $224.78. The deed of trust was filed for record on February 5, 1999. Mason did not become aware of these occurrences until mid-February when she noticed some unexplained transactions on her bank statement that, upon inquiry, she found to be related to the payoff of her First South Bank loan.

¶6. It is at this point that the evidence of what transpired becomes disputed. Mason claims that she was prepared at all times to take reasonable steps to remedy the problem but that she was never treated civilly by Southern Mortgage representatives nor did they ever propose a resolution of the problem that she thought was fair. She said that, finally, a Southern Mortgage representative showed up at her place of employment accompanied by a deputy sheriff and that, though she was not present and, thus, did not meet with these individuals at the time, it did cause her substantial embarrassment and humiliation. She testified that she did, shortly thereafter, meet with the Southern Mortgage representative at the sheriff's office, at which time he requested that she sign a document that he said would have reinstated her prior loan at First South Bank, but that she refused to sign the instrument.

¶7. Southern Mortgage presented evidence indicating that Mason had been uncooperative in resolving the problem from the beginning and seemed to be taking the position that she had no obligation regarding the payments erroneously made on her behalf. The president of the company indicated that he had directed the Southern Mortgage representative sent to meet with Mason to take a disinterested witness with him because of the somewhat volatile nature of previous conversations with Mason, and that was the reason the representative had sought to have a deputy sheriff accompany him to Mason's place of employment.

¶8. In all events, the matter remained unresolved and, as a result, Southern Mortgage commenced a non-judicial foreclosure of the deed of trust. Prior to the sale date, Mason filed this action and obtained a temporary restraining order to halt the proposed sale. In addition to the restraining order, Mason sought to

have the note and deed of trust canceled and asked for compensatory and punitive damages against Southern Mortgage. Southern Mortgage answered, claiming its entitlement to reimbursement for the funds expended, together with interest and the costs associated with undertaking the foreclosure. The chancellor granted a stay of the foreclosure and set the matter for hearing as to all issues, which trial was ultimately held on November 3, 1999.

¶9. At the conclusion of the trial, the chancellor issued a ruling that gave Mason thirty days to pay off the amounts advanced by Southern Mortgage to First South Bank and the Benton County Tax Collector, which totaled in the aggregate the sum of $24,883.12, without interest. Upon the condition that the sum be paid within that time, the chancellor directed Southern Mortgage to immediately satisfy and cancel its recorded deed of trust on Mason's residence. Finally, the chancellor ordered that, should Mason fail to pay the amount ordered within the allotted thirty day period, the stay of foreclosure would be lifted to permit Southern Mortgage to undertake a non-judicial foreclosure to recover the sum of $24,883.12 "plus the cost of foreclosure and nothing further." All other claims for relief from either party were denied.

¶10. Dissatisfied with that ruling, Mason perfected this appeal.

## II.

### A Preliminary Discussion Regarding the Issues Presented on Appeal

¶11. In order to fully understand the issues raised in this appeal and our disposition of them, certain matters presented at trial and occurring post-trial must be understood.

¶12. First of all, though Mason's complaint takes the position that she owes nothing to Southern Mortgage, she conceded during her testimony at trial that, under equitable principles, she did owe Southern Mortgage those amounts erroneously disbursed to First South Bank to satisfy her existing mortgage loan and to the Benton County Tax Assessor to satisfy taxes that were due.

¶13. Secondly, the parties have stipulated in the briefs before this Court that Mason has, during the pendency of this appeal, elected to voluntarily pay to Southern Mortgage the amount ordered by the chancellor. This has the effect of rendering that aspect of the judgment moot, so that the only issue left for this Court to deal with is Mason's contention that she is entitled to actual and punitive damages for the attempted wrongful foreclosure of the deed of trust on her property.

## III.

### Discussion

¶14. There can be little doubt that Southern Mortgage, when it began non-judicial foreclosure of its deed of trust, did so wrongfully. Mason's testimony was unequivocal that her prospective loan transaction was effectively ended when Southern Mortgage refused to fund the loan in the full amount indicated in the loan documents and, instead, attempted to modify the terms of the loan by offering her a lesser amount. There is nothing in the loan documents before this Court that would indicate that Southern Mortgage had the right to unilaterally modify the loan terms in such a way while still keeping Mason contractually bound to accept those modifications.

¶15. Though Southern Mortgage's position is unclear as to exactly when the loan agreement was rescinded,

the company president testified that, once Mason's dissatisfaction became clear, the company agreed to cancel the loan, and the company admits that the money advanced to satisfy Mason's existing mortgage loan and property taxes was advanced in error. That position is incompatible with the proposition that the deed of trust executed by Mason could serve as security for an unintended and unauthorized disbursement of funds.

¶16. However, as Mason herself conceded, there is no doubt that, under equitable principles of unjust enrichment, Mason was not entitled to retain the benefit of the funds erroneously advanced by Southern Mortgage on her behalf. *Milliken & Michaels, Inc. v. Fred Netterville Lumber Co.*, 676 So. 2d 266, 269 (Miss. 1996); *Magnolia Federal Savings & Loan Assn. v. Randall Craft Realty Co., Inc.*, 342 So. 2d 1308, 1311 (Miss. 1977). It was not, therefore, the fact that Southern Mortgage sought the return of the funds that gave rise to potential liability. Rather, it was that Southern Mortgage pursued the wrong remedy when it sought to non-judicially foreclose a deed of trust that had been rescinded by the time the company began the foreclosure process.

¶17. Because Mason has conceded her obligation to repay the amounts advanced on her behalf and has, in fact, actually done so, her sole remaining claim would appear to be an action for slander on title against Southern Mortgage for its attempt to detrimentally affect the title to her home place by asserting rights in the property under a deed of trust that it knew was no longer valid. *Walley v. Hunt*, 54 So. 2d 393, 396 (Miss.1951).

¶18. We are satisfied that Mason had a viable claim for slander on title by virtue of Southern Mortgage's attempt to foreclose a deed of trust that had been previously rescinded by mutual agreement. However, it is also beyond dispute that Southern Mortgage had a claim, sounding in equitable principles that prohibit unjust enrichment, against Mason for the return of the money erroneously advanced in her behalf, and that the attempted foreclosure, though ill-advised, was simply an attempt to obtain the return of those funds. Thus, the extent of Southern Mortgage's wrongful conduct is that it employed an incorrect remedy in pursuing what was, undoubtedly, a legitimate claim. There is the added consideration that, based on the chancellor's findings, Southern Mortgage was compelled to pursue formal proceedings to recover its funds only because Mason was uncooperative in efforts to return the parties to the status quo ante once the error came to light. These factors tend to militate against any finding that Mason suffered substantial damages at the hands of Southern Mortgage.

¶19. The chancellor did not make his decision based on considerations of slander on title and did not award a fixed amount of damages to Mason on that basis. However, Southern Mortgage was substantially penalized to Mason's benefit when the chancellor denied Southern Mortgage the right to recover any of its interest costs for the funds advanced from the time of advancement through thirty days after entry of judgment. Assuming an eight percent interest factor, this represented a sum in the approximate amount of $1,500. In view of the fact that, as the chancellor remarked in his findings, neither party was above reproach in this matter, we conclude that $1,500 is not so unreasonable an award for a slander on title action on the facts of this case that it would be warranted to reverse and remand this case for further consideration of damages due Mason.

¶20. It is a common practice for an appellate court to affirm the trial court when it appears that the trial court reached the right result, even if perhaps for the wrong reason. *Puckett v. Stuckey*, 633 So.2d 978, 980 (Miss. 1993). On that principle, we determine that it would be proper to view the approximate amount

of $1,500 in interest costs that were denied Southern Mortgage as an award of damages for slander on title and, on that basis, to conclude that such amount is within the range of discretion afforded the chancellor on the facts of this case.

¶21. The chancellor, sitting as fact-finder, has substantial discretion in the matter of determining whether an assessment of punitive damages is warranted. *Aqua-Culture Technologies, Ltd. v. Holly*, 677 So.2d 171, 185 (Miss. 1996) (citing *Fought v. Morris*, 543 So. 2d 167, 173 (Miss. 1989)). Such damages are appropriate only to punish and deter particularly egregious conduct. *Id.* (citing *South Central Bell v. Epps*, 509 So. 2d 886, 892 (Miss. 1987)). In this case, the chancellor found both parties to be at fault for their inability to resolve the difficulty that arose through inadvertence and declined to consider assessing punitive damages against Southern Mortgage for its attempt to recoup money that was undoubtedly due to it. Though we have concluded that non-judicial foreclosure was the wrong remedy, we do not consider that choice to demonstrate malice or a reckless disregard for Mason's rights under the circumstances, and, therefore, do not find error in the chancellor's decision not to award punitive damages.

¶22. We affirm the judgment of the chancellor; however, in view of the unique nature of this case, basic considerations of fairness suggest that appeal costs should be divided equally between the litigants.

¶23. **THE JUDGMENT OF THE CHANCERY COURT OF BENTON COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED EQUALLY, ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.**

> **SOUTHWICK, P.J., THOMAS, AND MYERS, JJ., CONCUR. CHANDLER, J., CONCURS IN RESULT ONLY. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., PAYNE AND BRIDGES, JJ. LEE, J., NOT PARTICIPATING.**

> IRVING, J., DISSENTING:

¶24. The majority finds that the closing attorney, unbeknownst to Mason and the Southern Mortgage representative with whom Mason had been dealing, mistakenly made the tax and mortgage payments from the proceeds of the $54,000 loan that was never in fact consummated. The majority calls this an error and faults Mason for not cooperating with Southern Mortgage to correct this so-called error. My reading of the record indicates (1) that the payments were not mistakenly made, (2) that Southern Mortgage refused to furnish all of the loan proceeds that it was obligated to furnish under the loan contract, (3) that Southern Mortgage unilaterally attempted to rescind the loan contract after the deadline for doing so had expired and (4) that Southern Mortgage wilfully and deliberately initiated foreclosure on Mason's residence to foreclose a deed of trust securing a loan that it never fully funded although it was obligated to do so.

¶25. As a result of the majority's view of the facts, a view which in my opinion is unsupported by the record, the majority concludes that Mason is not entitled to punitive damages and even assesses her with half of the costs of this action. For the reasons that follow, I respectfully dissent.

¶26. I find persuasive circumstantial evidence and direct testimony that the payments were made consistent with the original intent and agreement of the parties because at the time the payments were made Southern Mortgage had not unilaterally decided, as was within its power to do, to not fund the loan. A proper and close reading of the record compels the inescapable conclusion that Southern Mortgage, after learning that it

could not sell the loan paper because the purchaser would not accept the comparables undergirding the appraisal, attempted to get Mason to accept a loan for a lesser amount without telling her that it had already disbursed payments under the original loan agreement. When Mason refused to agree to apply for a new loan in a smaller amount, Southern Mortgage's scheme fell apart, ultimately ending in its unlawful and malicious attempt to foreclose Mason's property.

¶27. In order to fully illuminate my view, it is necessary to discuss some additional facts and matters not discussed in the majority opinion. As stated, the majority finds that the payments were made in error. By doing so, the majority skirts the issue of the validity of the contract and apparently concludes, without specifically saying so, that the loan agreement was rescinded. The majority finds that Southern Mortgage's position is unclear as to when the loan agreement was rescinded. The president of Southern Mortgage was solely responsible for this lack of clarity. However, this is not surprising given the fact that this witness knew nothing about the processing of Mason's loan. I note that the judgment entered by the chancellor was prepared by one of the attorneys. The judgment contains the following finding:

> For various reasons, the transaction was not completed. The Defendant erroneously paid off the existing note and deed of trust in the amount of Twenty-four Thousand, Six Hundred Fifty-eight and 34/100 ($24,658.34) Dollars. The Defendant also paid the taxes then due on the property in the amount of Two Hundred Twenty-four and 78/100 ($224.78) Dollars.

However, the chancellor made no such finding in his bench opinion. This, in pertinent part, is what the chancellor found:

> I might say this, the business practices of Southern Mortgage Company are very, very sloppy. Not very professional. I think if I paid 24,000 some odd dollars out of my money I would have started sending certified letters out return receipt requested stating the policy and stating everything. They didn't do it. So we've got two people up here swearing two different ways.
>
> * * * *
>
> I'm finding fault on both parties. I think they were both very, very sloppy. So this is what this Court is going to do. This Court is going to give Ms. Mason thirty days from this date to pay Southern Mortgage Company the sum of $24,883.12, which represents the amount that they paid off to the bank at Hardeman Count, Tennessee. The $24,658.34 and that figure also includes the sum of $224.78 which was paid in taxes.

¶28. It is clear that the chancellor, in the opinion rendered in this cause, did not find that the loan transaction was not completed or that the moneys were erroneously paid. As stated, these were findings which, for whatever reason, were inserted into the judgment by one of the attorneys. "[T]he matter of whether a trial court may adopt verbatim, in whole or in part, the findings of fact and conclusions of law of a party is within the court's sound discretion." *Rice Researchers, Inc. v. Hiter* 512 So. 2d 1259, 1266 (Miss. 1987). "[H]owever, our obligation of appellate deference to such findings is necessarily lessened." *Id*.

¶29. Further, it seems to me that a completed agreement is a prerequisite to a recission of that agreement; therefore, I am at a loss to understand how the majority can conclude that the loan agreement was mutually rescinded without first finding the existence of a completed loan contract. In my opinion, the majority places too much weight on the testimony of the president of Southern Mortgage who was the only witness to

testify on Southern Mortgage's behalf. I now turn to the facts supporting my view.

¶30. All closing documents, including the "Notice of the Right to Cancel" and the "Federal Truth-in-Lending Disclosure" statement, were signed on January 29, 1999, the date of closing. The funds were to be disbursed on February 3 which was after the expiration of Mason's three-day right to unilaterally rescind the transaction. Since Mason did not rescind the contract during the three business days following the closing, Southern Mortgage, but for its "Conditions of Funding" discussed in the following paragraph, was obligated to disburse the funds on February 3.

¶31. The "Conditions of Funding" document signed by Mason provided that the disbursement of the loan proceeds was subject to "a written property appraisal in an amount and of a character which [was] adequate as determined by Lender [Southern Mortgage] in its sole discretion." The document further provided that if the appraisal was not "received and approved by Lender by the scheduled funding date [February 3, 1999], Lender [could] terminate the transaction without liability to borrower." The "Conditions of Funding" document also contained a catchall provision which made "funding subject to final approval from the Lender [Southern Mortgage]." The "Condition of Funding" document, however, is silent as to what rights were accorded the borrower in the event the appraisal was not received and approved prior to the funding date.

¶32. Nevertheless, according to Southern Mortgage, an acceptable appraisal was not received and approved by Southern Mortgage by the funding date. This fact, however, is disputed by Mason who testified that the appraisal was submitted as a part of the loan application documents and that she was told by the branch manager for Southern Mortgage, before January 29, that her loan had been approved and that all she needed to do was to come in on January 29 and sign the closing documents. If Southern Mortgage's version of the facts is accurate, it would have been acting within its rights when it allegedly put a halt to disbursing the funds on the funding or disbursement date, February 3. I say "allegedly put a halt" to disbursing the funds because, as discussed later in this opinion, it appears that some funds may have been disbursed on February 3, and there is no doubt that funds were disbursed at least by February 4, if not on February 3.

¶33. However, the failure to disburse all of the funds on February 3 or 4 created additional problems which, in my opinion, are relevant to a complete and full understanding of the maliciousness of Southern Mortgage's actions. When the funds were not disbursed in total on February 3, the closing documents, especially the Settlement Statement and the Federal Truth-in-Lending Disclosure statement, were no longer congruent because the accuracy of both statements is time dependent. They could not become congruent again without executing new or modified documents which would necessarily involve changing the relevant dates.

¶34. The record reflects that the First South Bank deed of trust was paid on February 4, 1999. According to the address on the First South Bank deed of trust, First South Bank is located in Grand Junction, Tennessee. The January 29 closing of the anticipated loan took place in Corinth, Mississippi. Since the First South Bank mortgage was paid on February 4, 1999, it is safe to conclude that the funds for that payment were disbursed on February 3, 1999, unless they were hand delivered on February 4. The record also reflects that the deed of trust to Southern Mortgage was recorded in the office of the Benton County Chancery Clerk on February 5, 1999.

¶35. As stated, Southern Mortgage contends that there was a problem with the appraisal and that because

of this problem it halted the disbursement of funding on February 3. However, it fails to explain why on that very day, or at least the next day, its settlement agent disbursed funds for payment of the first mortgage to First South Bank. It is indeed perplexing how funding could be halted and disbursements made at the same time.

¶36. Under the terms of the "Conditions of Funding" document, it was within the sole discretion of Southern Mortgage whether to terminate the contract on February 3 if one of the conditions of funding had not been met. If such discretion had been exercised, according to the terms of the "Conditions of Funding," it would have been without liability to Mason. But even if the loan contract was not rescinded on February 3, Southern Mortgage, by the terms of its own regulations, would have been without authority to disburse funds on February 3 since it allegedly had determined that one of the conditions of funding had not been met.

¶37. Had Southern Mortgage disbursed all of the proceeds on February 3 and later claimed mistake on the basis that somehow it had inadvertently overlooked the fact that it did not have sufficient comparables to support the appraisal, its position would be more tenable. The facts, however, are more consistent with the view that it was Southern Mortgage's intention to lock Mason in the transaction on February 3 while at the same time refusing to disburse to her the portion of the loan proceeds which were to be given directly to her. It is interesting that the taxes against Mason's property also were paid off by Southern Mortgage on or about February 3, thereby assuring clear title in Southern Mortgage in case a foreclosure became necessary.

¶38. The loan either closed on January 29 or it did not. If it did not close, no funds should have been disbursed on February 3 or any other date. If it closed, all funds should have been disbursed on February 3 subject only to final approval by Southern Mortgage. Southern Mortgage was not authorized to approve a partial disbursement of funds. Either all funds were to be disbursed or no funds were to be disbursed. If any disbursement was to take place on February 3, Mason was to be given the balance of the loan proceeds on that date.

¶39. Southern Mortgage says the loan did not fund on February 3 but that the loan contract had not been rescinded. Of interest is the fact that Southern Mortgage never tendered to Mason the balance of the proceeds which were not disbursed on February 3. If the loan contract had not been rescinded on February 3, when sufficient comparables to support the appraisal were received later, there would not have been anything further to negotiate. All Southern Mortgage would have needed to do was forward to Mason the balance of the loan proceeds which had not been disbursed. Doing that, however, would not have cured the resulting inaccuracies in the Settlement Statement and the Federal Truth-in-Lending Disclosure statement, but it would have shown that Southern Mortgage still considered the transaction viable. Of course, Mason's version of what happened is different from the one told by Southern Mortgage. That is what I discuss next.

¶40. As stated, Mason testified that the appraisal was submitted as a part of the application documents and that she had been told by Charles Brumley, branch manager for Southern Mortgage, prior to the January 29 closing that everything was fine. She further testified that she expected, after the passage of three business days, that Southern Mortgage would call her to get her to sign the checks for the various disbursements that were supposed to be made from the loan proceeds. In fact, she testified that she expected to be called on the fourth day and that when she did not receive the call, she called the next day which was the fifth day

(February 5). It was at that time, according to Mason, when she was told by a representative for Southern Mortgage that he could not release the checks. This is her testimony:

> And the next day I called to the office and the representative told me that -- well I can't release those checks at this time because our home office has detected a problem with the appraisal, and he informed me that the Property Shop was required to go back and find two homes, at least two homes of comparable value to mine, and he assured me there would be no problem but they had to first get that in their files.

> \* \* \* \*

> *So I -- I told him that was fine.* And I waited again and finally I think that next sometimes [sic] we talked,[(1)] and he told me at that time -- he said I have the checks and everything, but I'm not going to be able to release those checks and we are not going to be able to get that loan funded, and if you want to come back into the office and make another loan you can do so. And he said, As [sic] a matter of fact if you come in and sign it today I will drive to De Soto County, I believe he told me, pickup those checks for you and you can get them today. And he also told me that his boss at that time was in Jackson, Tennessee, and that he was going to have him call me and I was to tell his boss that I needed that money right then. And true enough his boss did call, but I never told his boss that I needed it right then and there, but his boss went onto [sic] tell me that you have to come back in, and you have to make another loan and you do have to wait your three-day waiting period. And so I remember at this time -- when I first went over I had a question in my mind about all of the fees, so I did ask the man that I was talking to at that time, I said, "Well, what about all of these fees that you have."

(emphasis added). Mason further testified that at that time she thought she would go back in and reapply but that after talking things over with her family she changed her mind and went back the next morning and told "Charles" [Brumley] that she had changed her mind and decided not to reapply. She said that when she was told that there was no way the home office was going to fund the loan she believed at that time the deal was off.

¶41. Mason testified that when she got her bank statement around February 17 or 20 she saw a deposit that was unfamiliar to her. She called the Bolivar office of her bank[(2)] and inquired about the deposit. That was when she found out that her loan with First South Bank had been paid off and that the deposit represented a small refund. She testified that after obtaining this information she went about her business, expecting to get a payment book from Southern Mortgage but never did. Then on March 5 she received a call from Charles Brumley from the Alcorn County Branch of Southern Mortgage. This is what Mason testified to about that conversation:

> Well, he told me at that time -- he said, "Are you aware that your house was paid off?" I said, "Oh." He said, "Yes." And he said, "When you agreed that you would come back and reapply we paid it off." I told him, I said, No, you didn't, you paid it off on the 4th and that he was well aware when he talked to me on the 11th that, that note had been paid off. And he didn't bother to tell me anything about it. And so at the time that he called me it was -- I was in the middle of making arrangements for a relative -- my uncle that had lived right there with me all my life. And I said I had told him, I said -- asked him -- I said, "Give me a little time on this, because I need to get those funeral arrangements and all of that behind me."

¶42. Mason admitted that during this conversation Mr. Brumley asked her to go back to First South Bank, but she did not testify as to the purpose for going. She further testified that she did not tell Brumley that she would not go to First South Bank. Her testimony was that she told him that she was in the middle of making funeral arrangements for her uncle and requested that Brumley get back in touch with her.

¶43. According to Mason, the next time she had any contact with anyone connected with Southern Mortgage was when Brumley, along with an armed Benton County deputy sheriff, came unannounced to see her on her job. She was away from her desk at the time as it was around lunch time; therefore, she did not see him. However, Brumley left a card with the receptionist. Mason testified that she went to the sheriff's office and spoke with Brumley and that Brumley asked her to sign a form that he wanted to take back to First South Bank. She said she did not look at the form. She was upset and embarrassed. Mason testified that after she and Brumley had talked a while, he asked her if they had come to her about the matter when it first happened would she have given their money back. She further testified that Brumley asked her not to mention that he was there because he had taken it upon himself to come and try to get his boss's money back. According to Mason, she then got in her car and went back to her office.

¶44. Mason testified that when she arrived back at her office she received a call from Boise McNeil, the president of Southern Mortgage. She testified that McNeil showed no courtesy. She then described what happened:

> [H]e said, "You are aware that we paid that note off and I want to know what you are going to do about it." And I responded to him, "What am I going to do about it, it should be what are you going to do about it." And then I asked him not to call me at work any more. I gave him my phone number and told him the times that I would be at home, and I have not spoken to anybody from Southern Mortgage since then.

¶45. Mason described the next episode concerning this matter in this manner:

> I really expected at some point to hear from Southern Mortgage in writing or something, which I never did. So I think it might have been a couple of months later, I tried to contact Diane Taylor to find out exactly what I needed to do about the whole situation because I was honestly kind of left not knowing what to do at that point. However, we missed each other and I think I was getting ready to go on a trip in July and somebody called me at the house and asked me did I know my property was for sale.

¶46. Mason testified that she never had any thought that she would keep the money paid on her behalf. She further explained:

> [B]ut with all of the times that I've worked in a business for a number of years, whenever we make an error in whatever we do we are courteous about trying to correct that. And that's exactly what I expected from Southern Mortgage.

> * * * *

> I think what would be fair is that -- and what my problem has been somewhat along the way is that from the beginning given that they were a mortgage company who had made the goof-up error, or whatever you want to call it, then I felt like that they should have been the one to refinance that loan,

and that's what I felt like they should have done initially. At least we should have been able to get together and talk about it, rather than have somebody come over and say I want you to sign this, you know, that's the way I felt about it. And since then, I mean I've been embarrassed. I've had problems with my family as far as the -- the ad running in the paper, because my parents always told us to pay our bills. And then for that to be seen by my parents -- I tried to hide it, but somebody, or course, told them, it was all over the county about Annie Mason being defaulted on a loan.

¶47. Conspicuously absent from the evidence offered by Southern Mortgage is the testimony of Charles Brumley, the agent for Southern Mortgage who handled the transaction in Southern Mortgage's Alcorn County office, and Ray M. Gibson, Jr., the settlement agent. Hence, Mason's testimony is not refuted. The only witness to testify for Southern Mortgage was Boise McNeil, Jr., its president, who had no firsthand knowledge of what transpired other than what he acquired in the one telephone conversation discussed earlier in this opinion. McNeil offered this testimony:

Q. So, am I correct, then, that you would not have been familiar with this mortgage -- this application until some problem arose, there wouldn't be any reason for it?

A. I was familiar when it didn't fund.

* * * *

Q. Did you say, "Hey Brumley, we can't fund this one, we've got a problem. Hold up. Hold up."?

A. This is true.

Q. So if Mrs. Mason testified that she was told that the deal was off, it was off?

A. It wasn't off, we had to get the two comparables. And that is why we have the conditions of funding signed with each deal, and I think in this situation it prematurely closed a couple of days in advance due to Ms. Mason's work or couldn't get off or whatever.

* * * *

Q. Do you know -- Ms. Mason's testimony has been diametrically opposed to yours? Do you know where she would have gotten the idea that the mortgage was rescinded or cancelled by mutual agreement?

A. All I know is is [sic] Ms. Mason become [sic] belligerent from the start and had continued to stay that way, so we couldn't talk to her.

Q. When did she become belligerent with you personally?

A. The first time?

Q. When was the first time you talked to her?

A. This was the day after Brumley had -- had made contact.

Q. This was way over in March?

A. Okay.

Q. According to her testimony and according to the visitor sheet, March the 11th, and that was the first time you talked to her?

A. I'm going to say March 11, somewhere -- okay. Yes, March 11, yeah.

As stated, Southern Mortgage says the loan was not funded on the funding date. However, McNeil gave the following intriguing testimony:

Q. Y'all did not payout any more monies like you had said?

A. All of the checks were in the office laying [sic] there, she never come [sic] and picked them up.

Q. The checks were in the office probably the day of the signing, weren't they?

A. No.

Q. They just weren't supposed to be issued?

A. No, they weren't there the day of the signing.

Q. How did the checks get to the Corinth office?

A. Mr. Gibson [the settlement agent] overnight [sic] them.

Q. And when did Mr. Gibson overnight them?

A. Well, he had them the date that the loan would be funded.

Q. But you said it was not funded?

A. It was not funded?

Q. All right. How did Mr. Gibson come up with this money?

A. Well, I sent him the check.

Q. Did you send him the check?

A. Yes.

Q. *But, it's your testimony then, you sent him your check and you couldn't sell the mortgage, you couldn't turn around and get your money back?*

A. *At that point we needed two more comparables.*

In earlier testimony, McNeil had testified as to the nature of his business. This is what he said:

Q. What business is Southern Mortgage in?

A. Strictly mortgages.

Q. Okay. And you are in the mortgage origination business?

A. Correct.

Q. And it's your business to originate mortgages and then assign those or sell those in the mortgage market?

A. Yes, sir.

¶48. As stated, Southern Mortgage says the loan did not fund, yet the president of Southern Mortgage says he sent the funding check to the settlement agent. It simply does not happen that way in the real estate financing business, and the above colloquy clearly proves that it did not happen that way in this case. No check would have been sent from headquarters until the documents in the loan application package had been inspected and approved. A careful evaluation of McNeil's testimony reveals unmistakably that Southern Mortgage accepted the comparables, approved the appraisal and funded the loan, but when it attempted to sell the note, the purchasing entity balked at the sale because of the comparables attached to the appraisal. There is a difference between approving a loan application and funding the loan and unilaterally rescinding the approval after efforts to sell the negotiable paper have been unsuccessful. In my judgment, based on my review of the record, this is what Southern Mortgage attempted to do while at the same time disguising that action as an initial decision not to fund the loan.

¶49. Southern Mortgage claims to have learned about the payoff several days following the funding date of February 3. However, it contends that approximately three or four days after the funding date, it received the necessary comparables and was prepared to close the transaction but Mason refused. It claims that only after efforts at reconciliation with Mason failed that it was compelled to resort to foreclosure. This contention is simply belied by the facts. First, three or four days after the funding date would have been February 6 or 7. It is not disputed that on February 5, Mason called Charles Brumley and that Brumley told her that the home office had detected a problem with the loan. He told her that the home office needed to get two additional comparables but assured her that that would not be a problem. She said that was fine. Mason waited, and when she and Brumley again talked, (February 11), she was told that he had the checks but that he could not release the checks. As stated, he told her that Southern Mortgage was not going to fund the loan which it had agreed to do and that if she wanted to come back into the office and make another loan she could do so. In fact, Brumley told her that if she would come in and sign that day, he would drive to Desoto County and pick up those checks that day. She refused to apply for another loan. This testimony is not refuted in the record. Nothing McNeil said refutes this testimony. Again, remember McNeil first talked with Mason on March 11 which was more than a month after the funding date had expired.

¶50. Mason next heard from Southern Mortgage on March 5 when Brumley called and asked her if she knew her note with First South Bank had been paid off. She did not immediately let him know that she had learned that fact. However, when Brumley said to her that Southern Mortgage paid the note off after Mason had agreed to come in and reapply, she then told him that was not the case because the note had already been paid off when she and he discussed the possibility of her reapplying. It was during the conversation that Mason told Brumley that she had death in her family and to give her a little time to deal with the matter. The next time Mason heard from Southern Mortgage was when Brumley came to her job unannounced and accompanied by an armed deputy sheriff. All of these facts are not disputed in the record.

Only Brumley could have disputed them and he did not testify. As stated, the only witness to testify for Southern Mortgage was McNeil, and he could not dispute them because, according to his testimony, March 11 was the first time he spoke to Mason.

¶51. I agree that Southern Mortgage's remedy was an action for unjust enrichment, not foreclosure, but even so, I still am unable to accept the notion that Mason did anything to cause Southern Mortgage to disburse some but not all of the funds. Further, even if I accepted the notion, which I do not, that the payments were made innocently, without any sinister motive on the part of Southern Mortgage, the initiation of the foreclosure proceedings cannot be so characterized. It is not debatable that all of the loan funds were not disbursed by the funding date specified in the contract and had not been disbursed before, according to Southern Mortgage, the loan contract was mutually rescinded at some unspecified date. Certainly when Southern Mortgage initiated the two foreclosure proceedings Mason had not received the benefit of her bargain. The two attempts to foreclose the deed of trust were calculated acts, and Southern Mortgage should be required to pay for the grief, embarrassment and humiliation it caused Mason when it commenced foreclosure on her property with knowledge that it did not have a valid lien against it. Even before initiating foreclosure proceedings, Southern Mortgage showed its heavy handed tactics when one of its agents, accompanied by an armed deputy sheriff, came to see Mason on her job. Thereafter, Mason had to endure the humiliation of seeing her property advertised for sale pursuant to a foreclosure notice.

¶52. Perhaps the adage that best sums up the saga in this case is the one that says, "Two wrongs do not make a right." I readily agree that Mason was not entitled to keep the payments made by the agent for Southern Mortgage. To do so would have resulted in unjust enrichment to her. However, I fail to see or understand why she should be penalized for the erroneous legal path taken by Southern Mortgage, particularly when that course of action caused her so much grief. After all, it was Southern Mortgage, not Mason, that set in motion the events which bring us to this juncture. Mason did nothing to halt full disbursement on February 3 or to cause Southern Mortgage to make the payments on her behalf against its own regulations, and, while she was not entitled to keep the benefit of the payments, the responsibility for prohibiting that from happening rested with Southern Mortgage, the one who made the error in the first place. As it sought to do that, Southern Mortgage was charged with the responsibility to pursue the proper remedy in accordance with the facts. Mason was not the guarantor or protector of Southern Mortgage's legal rights. That responsibility reposed with Southern Mortgage.

¶53. Further, Mason did not procure the payments. They were made on her behalf without her consent. Also, the payments were made not in conformity with the terms and conditions of the contract that Mason had signed, but in violation of them. Even if she wanted to return the payments, she could not simply do so. The payments were not given to her. In order for her to return what was paid on her behalf, she, in all likelihood, would have had to obtain a loan. There is some indication in the record that Mason first attempted unsuccessfully to get the money from her retirement account. I note that the "Substitution of Trustee" document that was filed in preparation of the foreclosure was executed by Southern Mortgage on March 24, 1999, just thirteen days following Brumley's visit to Mason's place of employment while accompanied by an armed deputy sheriff. Even if Mason had initiated the process for obtaining a secured loan immediately after the visit by Brumley on March 11, she probably could not have completed the process before March 24.

¶54. Since Southern Mortgage contends that the note and deed of trust are valid, it stands to reason that Southern Mortgage then would be bound by the terms and conditions of the note and deed of trust.

Southern Mortgage never sent Mason a notice of delinquency or made written demand upon her for payment of the entire amount due under the terms and conditions of the deed of trust. In this regard, I note that the note signed by Mason provides in pertinent part:

> (c) Notice of Default/Notice of Acceleration
>
> If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest I owe on this amount. *The date must be at least 30 days after the date on which the notice is delivered or mailed to me.*

¶55. When Southern Mortgage began advertising Mason's property on June 6, 1999, to be foreclosed on July 5, 1999, she was only $1,837.72 in arrears[3] because the first payment under the note was not due until March 5, 1999, and even this figure was not valid because it was predicated on installment payments for a loan in the amount of $54,400 when only $24,883.12 had been expended by Southern Mortgage on Mason's behalf. Of interest is the fact, as stated, that Southern Mortgage did not send Mason a notice of acceleration as it was permitted to do, yet it demanded payment of the entire indebtedness. It was not entitled to make such a demand because it had not sent Mason a notice of acceleration in accordance with the terms of the note. In my judgment, this is more evidence of the fact that Southern Mortgage, in initiating the foreclosure, was not proceeding pursuant to what it perceived as a valid note and deed of trust. Rather, it was simply exercising its muscle to inflict punishment upon Mason for not immediately acceding to its demand made in the presence of an armed deputy sheriff.

¶56. In the complaint filed by Mason, she asked, *inter alia*, that she be awarded compensatory and punitive damages. During the trial, she testified that she had incurred attorney's fees in the amount of $2,500, court costs in the amount of $105, suffered embarrassment and humiliation and lost the benefit of $1,600 which she had paid to take a CPA exam. Clearly, Mason has suffered a compensatory loss. Further, I believe that, under the circumstances presented, Southern Mortgage's actions evince a willful and malicious wrong toward Mason or, at a minimum, a gross, reckless disregard for her rights. Accordingly, I believe she has presented a case for consideration of punitive damages. For the reasons presented, I would reverse and render judgment here on the question of Southern Mortgage's liability and reverse and remand for consideration of compensatory and punitive damages.

### KING, P.J., PAYNE AND BRIDGES, JJ., JOIN THIS SEPARATE OPINION.

1. It is not entirely clear from the record when this conversation occurred, but all indications are that it occurred on February 11.

2. It is not clear from the record whether her checking account was at a branch of First South Bank, but that appears to be the case.

3. The figure assumes the validity of the note and deed of trust. Of course, since Southern Mortgage never tendered the full amount of the loan proceeds, I do not accept the validity of either.